46352. STOVALL & COMPANY, INC. v. TATE.
46353, 46354. TATE v. McDONOUGH POWER EQUIPMENT,
INC. et al.; and vice versa.

WHITMAN, Judge. The appeals in this personal injury action are from rulings made below on the motions for summary judgment made by two of the several defendants. The plaintiff, Brenda F. Tate, suffered injury and loss of effective vision in her left eye as a result of being hit by a rock thrown by a rotary power lawn mower. She was sitting in a classroom at North Clayton Junior High School when a rock was thrown by the mower through an opening in the classroom window.

The plaintiff's several-count complaint named the manufacturer (McDonough Power Equipment, Inc.) and the distributor (Stovall & Company, Inc.) of the lawn mower as defendants. Also named as defendants were the principal (R. E. Cooper, Sr.) and the assistant principal (Bill J. Livingston) of North Clayton Junior High School.

Count 1 proceeds in negligence against all defendants with different specifications of negligence as to each. Count 2 proceeds against the manufacturer, alleging a failure of implied warranty on the basis of its manufacture for sale and resale. Count 3 proceeds against the distributor, also alleging a failure of implied warranty on the basis of its sale for consumer use. Count 4 proceeds against both the manufacturer and distributor on the theory of strict liability.

The trial court denied the manufacturer's and the distributor's motions for summary judgment as to Count 1, but granted their motions as to the remaining counts. The manufacturer and the distributor appeal and enumerate as error the trial court's ruling with respect to Count 1. The plaintiff cross appeals and enumerates as error the trial court's ruling with respect to Counts 2, 3 and 4.

Defendants Cooper and Livingston are not here on appeal.

The following uncontradicted facts appear from the record: In 1961 or 1962 defendant McDonough Power Equipment, Inc. began the process leading to the design, manufacture and sale of its "306-RD" rotary power riding mower. The mower is also

known as a "Snapper Comet Riding Mower." The machine cuts grass on the same principle as almost all other rotary power mowers. It has a blade which rotates at high speed in a plane horizontal with and very close to the ground.

With regard to the "306-RD" the blade is surrounded or encased in a metal housing except in two places. There is an opening on the underside of the housing which is necessary in order for the whirling blade to come in contact with the grass. The second opening is known as a grass port or discharge chute and is located on one side of the blade housing. The rotating blade cuts the grass and simultaneously expels it through the discharge chute. The continuous expulsion of grass as it is cut is necessary for the continuous functioning of the mower.

It was known by all parties to the suit that a rotary power mower will throw or sling such objects as rocks, wire, sticks, etc., out through the discharge chute if the whirling blade is allowed to come in contact with them. The defendant manufacturer designed the mower in question in a manner which equaled or exceeded the "American Standard Safety Specifications for Power Lawn Mowers," which is a standard approved by the American Standards Association. This standard addressed itself, among other things, to maximum allowable vertical and horizontal angles of exposure between the blade and discharge chute opening, i.e., the trajectory angle to which any projectile discharged through the chute must be limited. The standard also limited the total exposure area of the opening not to exceed a specified number of "square degrees." It is not disputed that the mower was well within all these limits.

Some rotary lawn mowers are equipped with grass catchers which attach to the discharge chute and collect the grass as it is cut and expelled. In performing such function the grass bag also catches projectiles thrown by the blade. Some rotary mowers have a deflector at the exhaust port which is intended to deflect projectiles thrown by the blade. It acts, in effect, to further restrict or eliminate the angle of exposure. Later models of the Snapper Comet have a "funnel" deflector available. Grass catchers are available if desired. That the mower in question had no grass catcher or deflector on the discharge chute was obvious to any observer.

The machine was sold in 1965 under the following circumstances: Mr. E. E. Oliver, as principal of G. W. Northcutt Elementary School, made a request to one T. N. Holbrook (a member of the School's P. T. A. who was in the farm machinery business) for the mower. Mr. Oliver specified the mower he wanted by brand name,—"Snapper Riding Mower." Mr. Holbrook did not handle lawn mowers but he made arrangements with defendant Stovall & Co., Inc., who was the Atlanta distributor for the manufacturer, for procurement of the machine. Stovall invoiced the machine through its authorized dealer, Corley Sales & Service. The machine was delivered to the G. W. Northcutt Elementary School, and at the time of delivery and at the request of Mr. Oliver, the janitor was shown how to operate the mower. Both the janitor and Mr. Oliver were warned of the danger of objects being thrown by the mower. Mr. Oliver thereupon instructed the janitor never to operate the mower while children were at school. In addition, an instruction manual was delivered with the mower. Among other things it contained the following: "Safety Suggestions for Power Lawn Mowers. All Snapper and Snappin' Turtle mowers are designed and engineered for maximum safety in operation. However, like all mechanical tools, care must be taken in their operation and maintenance to protect the operator and others from harm. These simple suggestions and rules are published for your benefit and safety. Please read them carefully and be sure that any operator of your power mower is familiar with them and observes them.

"Safety Suggestions. All Mowers. Remove all stones, wire, and other foreign objects from your lawn *before* starting to mow. Keep all guards in place and correctly adjusted for safe operation. Allow only fully competent operators to run your mower. Don't start the blade rotating until you are ready to start mowing."

Northcutt Elementary School, which owned the mower, was located adjacent to the North Clayton Junior High School. The officials of the two schools came to an agreement regarding the mower to the effect that if North Clayton would house it and share in the cost of maintenance, etc., then it would also have the use of it.

On October 2, 1968, approximately three years after the mower was purchased, the incident occurred which is the subject of this suit. The mower was being used on this occasion on the premises of North Clayton and was being operated by a special education student. In addition to its normal educational program, North Clayton conducted a special education program for the educable mentally retarded. These students received classroom instruction on varying levels as well as practical training in various vocational fields. Part of this latter training included the performance of tasks around the school such as painting, running floor buffing machines and operating the lawn mower. This student had exhibited the ability required to operate the lawn mower and had done so on approximately five occasions.

The principal of North Clayton (defendant R. E. Cooper, Sr.) was aware of the rock throwing propensity of rotary lawn mowers. He had established a policy that there would be no grass cutting when children were on the playground because of the danger of the mower slinging debris or rocks and, further, that the grass was not to be cut around a classroom area while classes were in session. His policy was that any area to be mowed was to be inspected and cleared. He, as principal, delegated the supervision of this policy to his assistant principal.

The assistant principal (defendant Bill J. Livingston) devoted a great deal of his time to guiding and working with special education students. He was aware of the dangers of rotary power mowers. He instructed the student here involved to pick up paper, rocks and tree limbs. This was the procedure before every grass cutting operation. He was always present and supervised the operation of the lawn mower.

On the occasion in question the student started the mower in the presence of Livingston. Livingston left the area to get a hammer and some nails in preparation for some repair work. He was gone between 3 and 5 minutes. The student at one point during this time drove the mower within 10 or 12 feet of a classroom where a class was in session. There was a patch of gravel in the area. The mower threw a rock through the narrow opening in a classroom window. It went across the room

and hit the plaintiff who was seated in the rear seat of the row most distant from the windows. The rock struck plaintiff in her left eye, causing severe injury and loss of effective vision in that eye. *Held:*

1. In Count 1 of the complaint the plaintiff alleged that the manufacturer was liable to her because it had been negligent. It was alleged that the manufacturer failed to properly design the mower in that it had not been provided with a device to deflect to the ground any hard objects struck and thrown from under the mower by the blade, as a result of which it was an inherently dangerous instrumentality. The complaint set forth specific allegations of negligence, to wit, (1) in manufacturing a defective mower which did not have a deflecting device; (2) in improperly designing the mower so that it did not have a deflecting device; (3) in failing to warn that it had no deflecting device; (4) in failing to warn what effect the mower would have if its blade struck a rock or other hard object; and (5) in failing to warn that the mower would throw rocks and hard objects through the grass port with great force.

This is not a case of a mower constructed with concealed defects or flawed materials. Nor is it one involving an imperfectly or improperly assembled mower. Neither did the mower malfunction mechanically, rather the evidence is that it functioned properly for its intended purpose of cutting grass. In short, this is not a case of an eminently dangerous device as was, for example, the sofa bed in *Simmons Co. v. Hardin,* 75 Ga. App. 420 (43 SE2d 553), where an improperly assembled spring came loose and struck plaintiff in the eye. Rotary riding mowers generally, like automobiles, are not classified by our law as inherently or per se dangerous. *Miles v. Harrison,* 115 Ga. App. 143, 146 (154 SE2d 377), reversed on other grounds 223 Ga. 352 (155 SE2d 6, 25 ALR3d 1310). A rotary power mower is potentially dangerous but is not unique in this sense. As was observed in Jamieson v. Woodward & Lothrop, 247 F2d 23, 28 (D.C. Cir. 1957), a case in which plaintiff sought to recover from the manufacturer of an elastic exerciser which slipped off plaintiff's foot and struck her in the eye: "There are on the market vast numbers of products as to which the law holds the

manufacturer to a duty to warn of foreseeable dangers or to provide safeguards against such dangers. But there are also on the market vast numbers of potentially dangerous products as to which the manufacturer owes no duty of warning or other protection. The law does not require . . . that a manufacturer warn or protect against every injury which may ensue from mishap in the use of his product. Almost every physical object can be inherently dangerous or potentially dangerous in a sense. A lead pencil can stab a man to the heart or puncture his jugular vein, and due to that potentiality it is an 'inherently dangerous' object; but, if a person accidently slips and falls on a pencil point in his pocket, the manufacturer of the pencil is not liable for the injury. He has no obligation to put a safety guard on a lead pencil or to issue a warning with its sale. A tack, a hammer, a pane of glass, a chair, a rug, a rubberband, and myriads of other objects are truly 'inherently dangerous,' because they might slip. They cause accidents and injury even more often, we expect, than do rubber exercisers. But the doctrines fashioned by the law for inherently dangerous objects do not encompass these things. A hammer is not of defective design because it may hurt the user if it slips. A manufacturer cannot manufacture a knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger. The law does not require him to warn of such common dangers."

What duty rests upon a manufacturer with regard to the machines it makes? In Campo v. Scofield, 301 N. Y. 468 (95 NE2d 802), the plaintiff was working on his son's farm and feeding onions into an "onion topping" machine when his hands became caught in its revolving steel rollers and were badly injured. His suit against the manufacturer alleged negligent design, manufacture and construction in failing to equip it with a guard or stopping device. The court stated (p. 472): "If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of

making a machine accident proof or foolproof. . . [H]e is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. To illustrate, the manufacturer who makes, properly and free of defects, an axe or a buzz saw or an airplane with an exposed propeller, is not to be held liable if one using the axe or the buzz saw is cut by it, or if someone working around the airplane comes in contact with the propeller. In such cases the manufacturer has the right to expect that such persons will do everything necessary to avoid such contact, for the very nature of the article gives notice and warning of the consequences to be expected, of the injuries to be suffered. In other words, the manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all.

"To impose upon a manufacturer the duty of producing an accident-proof product may be a desirable aim, but no such obligation has been—or, in our view, may be—imposed by judicial decision. Suffice it to note that, in cases dealing with a manufacturer's liability for injuries to remote users, the stress has always been upon the duty of guarding against *hidden* defects and of giving notice of *concealed* dangers. [Citations]." In the case of Murphy v. Cory Pump & Supply Co., 47 Ill. App. 2d 382 (197 NE2d 849), the plaintiff alleged that her injuries were caused by defendant-manufacturer's negligent design of a riding mower in failing to provide a guard or shield on the front of the mower; that such would have prevented the blade from coming in contact with her leg when she, while running, slipped and fell in the yard in front of the mower being operated by her sister. The court held that whether the manufacturer had such a duty under the facts was a question of law. "This mower would have caused no harm to plaintiff unless she, by her own acts, or by the acts of some third person, caused her to come in contact with it. Defendant should not be required to anticipate or protect against any such accident as the one which caused plaintiff's injuries. The mower functioned properly for the purposes for which it was designed; it was without any latent defect; and its functioning created no danger or peril not known to the user." P. 402.

What of the circumstance that it was not a consumer or a user or one such as the girl in the Murphy case that was injured by the mower? Instead, the injury was suffered by one who can only be classified as an innocent involuntary bystander.

Even among those jurisdictions in which the doctrine of strict liability (see Restatement 2d, Torts, Vol. 3, § 402A) has been adopted, there is a diversity of opinion as to whether one who is injured by a product in a defective condition may proceed against the manufacturer or distributor where such person is neither a purchaser nor a user. Annot. 33 ALR3d 415. Georgia is not a strict liability State. Even if it were, the present case is not one involving a product with a latent, unobservable defect or one with unwarned-of dangers for which the doctrine was fashioned and to which it has been consistently limited. Annot. 13 ALR3d 1057.

The plaintiff relies heavily upon the case of Sills v. Massey-Ferguson, Inc., 296 FSupp. 776 (N.D. Ind. 1969), a case decided under the law of a jurisdiction in which the doctrine of strict liability has been adopted. But aside from strict liability recovery was also sought for simple negligence. The plaintiff-bystander in the Sills case was hit in the jaw by a bolt picked up and thrown about 150 feet by a tractor-towed rotary mower manufactured by the defendant. The court denied manufacturer's motion to dismiss the three-count complaint. As to the simple negligence count (wherein it was alleged that the defendant knew or should have known of the risk of injury to the public from objects being thrown by the mower and was negligent in failing to design a mower which would allow such; in designing a mower with 5- and 6-foot openings in the housing; in failing to provide guards; and in failing to warn the public to stay a safe distance away) the court stated that it could not be said as a matter of law that the defendant's alleged conduct was not a proximate cause of plaintiff's alleged injuries. As to another count based on breach of implied warranty, and still another count cast in strict liability, the court also denied the motion to dismiss. In short, it was held that the complaint stated a claim for which relief might be granted. The appeals in the case sub judice are taken from rulings on motion for summary judg-

ment, and we are, therefore, concerned less with the complaint and more with what has been made to appear as disputed or undisputed with regard to the material facts in the matter; and in applying the law thereto. But we are impressed by an observation made by Judge Eschbach in the Sills case, p. 782: "The court has held that defendant owed plaintiff a duty not to put on the market a product in a defective condition unreasonably dangerous to him. It would appear that there are essentially two ways that a manufacturer may discharge this duty. The first is to make a product that is safe. The second is to make a product which may present some danger but in such case to give an effective warning of the danger to those who foreseeably will be affected by it. In this connection, a 'perfectly' made product may be defective in the legal sense if it is unreasonably dangerous in the absence of a warning. [Cit.] The rationale underlying the warning concept is that a person who is injured by a product in spite of his receiving an effective warning about its dangers is deemed to have incurred the risk and consequently may not recover for his injuries. [Cit.]

"In a slightly different setting, it would appear that the warning need not necessarily be given to the person actually injured in order for the manufacturer to escape liability. It would seem that the warning may be given to a person in a position such that he may reasonably be expected to act so as to prevent the danger from manifesting itself. [Cit.] Perhaps this goes to proximate cause as much as to 'defect.' . . In addition, plaintiff has alleged that the dangers due to the defectiveness were not obviated by a warning from the manufacturer-defendant. Plaintiff should have the opportunity to present his evidence to the finders of fact. As defendant suggests, however, there may be situations in which it is difficult or impossible to give an appropriate warning. The required warning, to be sure, must be an adequate and sufficient warning which will apprise the reasonable person of the dangers at hand. [Cit.] In this case, while it would be admittedly difficult for a manufacturer to warn the general public, it might be that a warning as to safety precautions given to the user of the mower would discharge the duty."

In the case sub judice we have a typical grass-cutting object-

throwing rotary power mower of which there are thousands upon thousands. The undisputed evidence is that the mower contained no deflection device or grass catcher on the grass discharge chute. But it is likewise undisputed that the absence of such devices was obvious to the most casual observer. It was known by the manufacturer that the mower would throw objects out the discharge chute if allowed to come in contact with them. The manufacturer's design and construction was such that the angles of exposure and total exposure area to projectiles was less than the maximum allowable under industry safety standards. There was no impression given that the mower was harmless. To the contrary, advice was given appropriate to the recognized dangers. Whether through the safety advice contained in the "Mow Safely" booklet delivered with the machine, or whether from the oral warnings given at the time of delivery, or whether through experience and plain common sense, the evidence is that all those persons responsible for the mower's use recognized the potential danger. Thus, the manufacturer's warning was effective, or cumulative at least.

The trial court erred in denying the manufacturer's motion for summary judgment as to Count 1.

2. The trial court likewise erred in denying the distributor's motion for summary judgment as to Count 1.

3. The plaintiff was not a beneficiary of any warranties, express or implied, arising out of the manufacture and various sales in this case. Uniform Commercial Code § 109A-2—318 (Ga. L. 1962, pp. 156, 191). Such was the law even prior to the UCC. *Revlon, Inc. v. Murdock,* 103 Ga. App. 842 (120 SE2d 912); *Wood v. Hub Motor Co.,* 110 Ga. App. 101 (137 SE2d 674). And see Brooks v. Eastern Air Lines, Inc., 253 FSupp. 119 (N.D. Ga. 1966); Whitaker v. Harvell-Kilgore Corp., 418 F2d 1010 (5th Cir. 1969), petition for rehearing denied 424 F2d 549 (5th Cir 1970). The trial court did not err in granting the manufacturer's and distributor's motions for summary judgment as to the second and third counts, respectively.

4. Georgia has not adopted the doctrine of strict liability, a doctrine under which a plaintiff need not prove negligence, a doctrine under which the highest degree of care by a manufacturer

is no defense. If there is to be a departure in product liability law from "liability for fault" to "liability without fault," it should be via legislative enactment. The status of our present law in this regard is accurately summarized in Whitaker v. Harvell-Kilgore, Inc., 418 F2d 1010, supra. The trial court did not err in granting the manufacturer's and distributor's motion for summary judgment as to Count 4.

*The order on motions for summary judgment appealed from in Cases 46352 and 46354, to the extent that it denied motions for summary judgment as to Count 1 of the complaint, is reversed. The order on motions for summary judgment appealed from in Case 46353, which granted summary judgment as to Counts 2, 3 and 4 of the complaint, is affirmed. Hall, P. J., and Eberhardt, J., concur.*

ARGUED JUNE 30, 1971—DECIDED OCTOBER 5, 1971—
REHEARING DENIED OCTOBER 18, 1971—

*Swift, Currie, McGhee & Hiers, W. Wray Eckl, Hunter S. Allen, Jr.,* for Stovall & Co.

*Cullen M. Ward, Frank M. Eldridge,* for Tate.

*Powell, Goldstein, Frazer & Murphy, Robert W. Patrick, Jerry B. Blackstock,* for McDonough Power Equipment, Inc.