67758. FORD MOTOR COMPANY v. STUBBLEFIELD et al.

SOGNIER, Judge.
This wrongful death action arising out of an automobile collision was brought by William O. Stubblefield, individually and as administrator of the estate of his minor child, and by Linda P. Standley, individually and as natural mother of the deceased minor child. Suit was filed originally against multiple defendants, but during trial plaintiff-appellees voluntarily dismissed their complaint against all defendants except appellant Ford Motor Company. The sole theory of liability against Ford was its alleged negligence in the design of the automobile in which 15-year-old Terri Stubblefield was a passenger when she was fatally injured. William O. Stubblefield prayed for recovery in his individual capacity for medical, hospital and funeral expenses, and in

his capacity as administrator sought damages for personal injury, pain and suffering and an award of punitive damages and expenses of litigation. Linda P. Standley sought damages for the wrongful death of her daughter. The death resulted from injuries sustained in a collision occurring July 10, 1977, when the 1975 Ford Mustang II in which Terri Stubblefield was riding was struck from behind while stopped in traffic by another car traveling at an estimated speed of 56 to 65 m.p.h. A "ball of fire" engulfed the rear of the Mustang II at impact and Terri, who was sitting in the back seat, was severely burned.

The question presented to the jury was whether Ford, through the negligent design and placement of its fuel system in the 1975 Mustang II, exposed the occupants of this automobile to unreasonable risk of injury and, insofar as punitive damages were concerned, whether Ford's management acted with that entire want of care which would give rise to conscious indifference to the consequences in marketing the automobile. The jury found in favor of appellees on all counts. Ford appeals the judgment entered on the verdict, enumerating as error the failure of the trial court to direct a verdict in its favor on the issues of negligence and causation, liability for punitive damages, and expenses of litigation including attorney fees; and in refusing to grant a motion for judgment notwithstanding the verdict, or in the alternative a new trial, on these issues. In particular, Ford contends that the improper admission of the following evidence was harmful and prejudicial: (1) permitting appellees' expert witnesses to express opinions as to the ultimate issue in the case that Ford had acted negligently, deliberately and callously; (2) permitting these experts to read selectively from Ford documents and give their opinions as to the intent of the authors; (3) admitting into evidence an irrelevant transcript of a so-called "Nixon tape," without proper foundation, for the purpose of prejudicing the jury; and (4) admitting tests, reports, documents, films and other materials generated after the date of manufacture of the 1975 Mustang II, or pertaining to vehicles dissimilar to the 1975 Mustang II.

1. Appellees presented copious documentary exhibits, internal memoranda and confidential corporate reports reflecting the course of Ford's research and development of the Mustang II, which were explained and interpreted to the jury by two expert witnesses. Ford does not challenge the expertise of these witnesses, Frederick Arndt (automobile engineering) and Dr. Leslie Ball (systems safety analysis), on their respective subject matters but insists that their testimony presented conclusions as to the ultimate issue which jurors could ordinarily draw for themselves, and was therefore outside the parameters of the rule set forth in *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981) in regard to the admissibility of such evidence.

"The opinions of experts on any question of science, skill, trade

or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-9-67. The negligence issue in this case turned on an evaluation of mass production engineering design and policy objectives. Dr. Ball explained that a safety systems program is divided into several functions and procedures such as (1) the setting of policies and objectives, generally imposed by management; (2) the development of the program; (3) the release to production, at which point catastrophic hazards are reviewed in conjunction with recommended controls; (4) production activities and quality control; (5) support activities (warnings, instructions, etc.); and (6) response to user experience. In his function as a safety systems scientist, Dr. Ball studied hundreds of Ford's technical internal documents recording decisions and recommendations from various engineers and executives in regard to design of the Mustang II dating from 1968 to 1977, and determined how each fit within the analysis as a constituent factor in Ford's organization in the six categories of safety management functions. After giving a detailed analysis, Dr. Ball was asked to give his opinion as to whether he thought Ford had responded reasonably in its decision making process from the standpoint of safety science management, and he was of the opinion that it had not.

Mr. Arndt, who had worked in research projects devoted specifically to the motor vehicle "crash fire problem," reviewed a multitude of crash tests and internal Ford memoranda, using his engineering expertise to simplify technical terms and explain such factors as the formation of vapor clouds and resulting fireballs; friction ignition; basic crash mechanics; crash similarities between 1974, 1975 and 1976 Mustang II's; characteristic fuel tank crush features of that model; the predictable role of axle-housing intrusion; various types of crash tests (sled, moving barrier, fixed barrier, actual); corresponding crash standards; inertial forces upon the fuel in the fuel tank during the collision phase (accelerative followed by decelerative) and their relationship to tank penetrations caused by axle-housing intrusion; available design alternatives and solutions, and the effects of each. After this analysis Mr. Ardnt stated that in his opinion the design utilized by Ford in the Mustang II was not reasonably safe.

The jury was required to determine from this complicated decision-making process, described by Ford as "a morass of conceptual, political and practical issues," whether the design of the Mustang II was unsafe, and if so, whether Ford had knowledge of the hazardous aspects and under the circumstances acted reasonably in marketing the automobile without changing the design. The opinions which Dr. Ball and Mr. Arndt offered the jury were not mere speculations regarding Ford's intent, but were based upon their professional analyses of the process by which the corporate decisions regarding the 1975

Mustang II were made. Our review of the voluminous documentary evidence and testimony convinces us that without the extensive and detailed analyses provided by these experts, together with their opinions based upon these constituent factors which must be deemed highly technical, sophisticated and peculiarly within the specialized science of these experts, the ultimate issue would have been " 'beyond the ken of the average layman.' " *Smith v. State*, 247 Ga. at 619, supra. Accord *Bethea v. State*, 251 Ga. 328 (10) (304 SE2d 713) (1983). Accordingly, we find no abuse of discretion in the admission of their opinions. See *Coursey Bldg. Assoc. v. Baker*, 165 Ga. App. 521 (2) (301 SE2d 688) (1983); *Pembrook Mgt. v. Cossaboon*, 157 Ga. App. 675 (5) (278 SE2d 100) (1981).

2. Ford contends that the trial court erred in denying its motions for directed verdict, judgment notwithstanding the verdict, and a new trial because sufficient competent evidence was not presented to support the verdict on the issue of negligence or to establish that any act or omission on its part was the proximate cause of appellees' alleged damages. Ford relies on evidence that it tested and experimented with several devices to protect the fuel tank from rear-end impact hazards, but was unable to develop an acceptable design alternative to improve fuel system integrity prior to the sale of appellees' vehicle in September of 1974. However, the evidence also showed that a management decision was made during that time period to delay implementation of protective hardware for the Mustang II's fuel tank until "required by law," even though the body design and fuel tank location of both the Pinto and the Mustang II caused the fuel tank to jam into the rear axle when struck from behind. Ford's internal documents referred to this as a "failure mode," and the problem was known and documented as early as 1968 when Ford analyzed the hazard of post-crash, fuel-fed automobile fires as shown by accident data. When Ford engineers sought guidance from company management as to what should be done, Ford's executives decided to "defer adoption" of any protective devices until 1976, enabling it to "realize a design cost savings of $20.9 million as compared to incorporation in 1974." A directive was issued implementing this decision which stated that "actual hardware will not be added until required by law . . ." Ford finally adopted a polyethylene shield which was installed in the fall of 1976 on the 1977 model Mustang II, but no effort was made to inform owners of older models of the dangers of post-collision fire.

The instant case was tried on a theory of negligence rather than of strict liability (see OCGA § 51-1-11).[1] Appellees alleged that Ford

---

[1] For discussions which point out the differences between these two bases of recovery in products liability actions, see *Ford Motor Co. v. Carter*, 239 Ga. 657, 660-663 (238 SE2d 361) (1977); *Center Chem. Co. v. Parzini*, 234 Ga. 868, 869 (2) (218 SE2d 580) (1975); *Ellis v.*

was negligent in designing the 1975 Mustang II automobile and in failing to warn of a danger of which it had knowledge. A definition of negligence quoted with approval by our Supreme Court is " 'the failure to observe, for the protection of the interests of another person, that degree of care, precaution, and vigilance which the circumstances justly demand, whereby such other person suffers injury.' [Cit.]" *Ford Motor Co. v. Carter*, 239 Ga. 657, 662 (238 SE2d 361) (1977). " 'If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands.' " *Stovall & Co. v. Tate*, 124 Ga. App. 605, 610 (184 SE2d 834) (1971). See *Poppell v. Waters*, 126 Ga. App. 385, 387 (1) (190 SE2d 815) (1972). "However, the converse of such rule is also true, if in the normal functioning of the product as designed, such function creates a danger or peril that is not known to the user or bystander, then the manufacturer is liable for injuries proximately caused by such danger." Eldridge, Prods. Liability in Ga., 34, § 2-21, Negligent Design (citing *Stovall, Poppell*, supra). Thus, the manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger. *Beam v. Omark Indus.*, 143 Ga. App. 142, 145 (237 SE2d 607) (1977).

Ford argues that its liability should extend only to a use of its product that could be reasonably contemplated and anticipated and that the collision in the instant case, albeit without any volition on the part of the injured party, constituted such a misuse of the product that Ford had no legal duty to foresee or to guard against it. We do not agree.

It is true that when the use to which a product was being put at the time of injury is not that originally intended by the manufacturer, liability of the manufacturer depends initially upon the foreseeability of that particular use. Cf. *Union Carbide v. Holton*, 136 Ga. App. 726, 729 (222 SE2d 105) (1975). However, it is likewise true that " '[t]he maker of an article for sale or use by others must use reasonable care and skill in designing it . . . so that it is reasonably safe for the purposes for which it is intended, *and for other uses which are foreseeably probable. . . .*' " (Emphasis supplied.) *Friend v. Gen. Motors Corp.*, 118 Ga. App. 763, 764 (165 SE2d 734) (1968). See *Ford Motor Co. v. Lee*, 137 Ga. App. 486, 487 (1) (224 SE2d 168) (1976), aff'd in part, rev'd in part on other grounds, 237 Ga. 554 (220 SE2d 379) (1976); *Ford Motor Co. v. Hanley*, 128 Ga. App. 311, 316 (6) (196

*Rich's, Inc.*, 233 Ga. 573, 576-577 (212 SE2d 373) (1975); *Firestone Tire &c. Co. v. Pinyan*, 155 Ga. App. 343, 349 (5)-350 (270 SE2d 883) (1980).

SE2d 454) (1973); *Gen. Motors Corp. v. Jenkins*, 114 Ga. App. 873, 876 (2) (152 SE2d 796) (1966). Thus, "one placing in the channels of commerce an item containing a defect which under foreseeable conditions is likely to cause injury may be negligent because of failure to warn the prospective purchaser." *Evershine Prods. v. Schmitt*, 130 Ga. App. 34, 37 (3) (202 SE2d 228) (1973).

Vehicular collision is an event which is foreseeable by the manufacturer. *Hanley; Friend*, supra; Rozier v. Ford Motor Co., 573 F2d 1332, 1347-1348 (5th Cir. 1978). Accordingly, an automobile manufacturer may be held liable for negligently producing a vehicle with a defect which causes injury when activated by a foreseeable collision. Such manufacturer may be subject to liability for failing to adequately warn the user of the known or foreseen danger if there is no reason to believe the user will realize the dangerous condition. See *J. C. Lewis Motor Co. v. Williams*, 85 Ga. App. 538, 541-542 (69 SE2d 816) (1952). See also *Stewart Oil Co. v. Bryant*, 93 Ga. App. 191 (1) (91 SE2d 48) (1956); *Moody v. Martin Motor Co.*, 76 Ga. App. 456, 459-461 (46 SE2d 197) (1948).

Whether or not Ford was negligent in designing this automobile and in other particulars, and whether negligence on the part of Ford was the proximate cause of appellees' injuries, were questions for the jury. See *Beam*, supra at 144-145; *Long Mfg. v. Grady Tractor Co.*, 140 Ga. App. 320, 321 (1) (231 SE2d 105) (1976); *McClurd v. Reddick*, 135 Ga. App. 136, 137 (1) (217 SE2d 163) (1975); *Ford Motor Co. v. Hanley*, supra at 317 (6); *Charles Seago &c. Co. v. Mobile Homes*, 128 Ga. App. 261, 264 (196 SE2d 346) (1973); *J. C. Lewis Motor Co.*, supra at 543. Cf. *Firestone Tire &c. Co. v. King*, 145 Ga. App. 840, 842 (244 SE2d 905) (1978).

"A direction of verdict is proper only where there is no conflict in the evidence as to any material issue; and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. [Cits.]" *Ford Motor Co. v. Lee*, supra at 489 (7). The evidence showing knowledge on the part of Ford of a potentially unsafe condition and the marketing of the product with such knowledge and without adequate warning to users was sufficient to carry the issues of negligence and proximate cause to the jury. The trial court did not err in failing to direct a verdict for Ford, or in denying Ford's motions for judgment notwithstanding the verdict, or in refusing to grant a new trial on the ground that there was no evidence of negligence. Id.; *Firestone Tire Co. v. King*, supra.

3. We find no merit in Ford's objections to the admission in evidence of a transcript of a taped conversation between Richard M. Nixon, then President of the United States, Lee Iococca, then president of Ford, and Henry Ford on the grounds that (a) there was no showing of inaccessibility of the tape itself, thus violating the "best

evidence" rule; (b) that there was no showing of the reliability or authenticity of the transcript; and (c) that the transcript was prejudicial and contained hearsay and irrelevant material.

(a) Regulations issued pursuant to Section 103 of the Presidential Recordings and Materials Preservation Act, Pub. L. 93-526, 88 Stat. 1695 (1974) (see 44 USC § 2107, note), expressly provide for archival processing of the "Nixon" tapes, including "reproducing and transcribing tape recordings" which are under the "exclusive legal custody and control" of the Administrator of General Services. 41 CFR §§ 105-63.103; 105-63.104 (h). Under 41 CFR § 105-63.404 (a) (3), "[t]he original tape recordings shall not be available for public access." Although, as Ford argues, 41 CFR § 105-63.404 (a) (3) provides that the Administrator will duplicate the original tape for "public and official *reference use*" (emphasis supplied), a reading of the regulations indicates that such duplicate copies are intended for use by researchers (in order to avoid wear and tear on the original tape) and that the duplicates are to be made available to researchers only in the National Archives Building in Washington, D.C., or at other reference locations established by the Administrator. 41 CFR §§ 105-63.403; 105-63.404 (c). Thus, the original tape's inaccessibility is the result of federal regulation and appellees were further limited by those regulations to production of only a transcript of the original tape.

(b) The transcript of the tape was authenticated by the official seal of the National Archives of the United States. "44 U.S.C. § 2112 (b) provides: 'There shall be an official seal for the National Archives of the United States which *shall be judicially noticed*. [Emphasis by the court.] When a copy or reproduction, furnished under this section, is authenticated by the official seal and certified by the Administrator, the copy or reproduction shall be admitted in evidence equally with the original from which it was made.'" *McDaniel v. Gangarosa*, 126 Ga. App. 666, 668 (1) (191 SE2d 578) (1972). These laws are controlling as to the admissibility of such evidence. Id. We find no merit in Ford's remaining arguments concerning the authenticity of the evidence. Therefore, Ford's objections directed to the authenticity or reliability of the transcript were overruled properly.

(c) Nor was this transcript inadmissible on grounds of irrelevance or prejudice. While there was no specific discussion among the participants as to fuel system integrity, the meeting took place just one day after the decision of Ford's management to defer the adoption of protective devices for the fuel tanks until required by law, and the gist of the taped conversation concerned the necessity for the Department of Transportation to "cool it" as to safety requirements and how the government might make those standards more responsive to the auto makers' cost effectiveness.

"Any evidence is relevant which logically tends to prove or disprove any material fact which is at issue in the case, and every act or circumstance serving to elucidate or throw light upon a material issue or issues is relevant. [Cit.] Moreover, where the relevancy or competency of evidence is doubtful, it should be admitted and its weight left to the determination of the jury. [Cits.]" *Kelly v. Floor Bazaar*, 153 Ga. App. 163, 165 (264 SE2d 697) (1980). Accord *Lloyd v. Stone Mtn. Mem. Assn.*, 165 Ga. App. 679 (1) (302 SE2d 602) (1983); *Southern Bell &c. Co. v. Coastal Transmission Svc.*, 167 Ga. App. 611 (4) (307 SE2d 83) (1983). Also, since punitive damages were sought, one of the material facts at issue in this case was whether Ford acted with conscious disregard for the consequences when making policy decisions as to fuel tank safety on the Mustang II, and this conversation clearly served to "elucidate or throw light upon" that question.

Moreover, Ford has failed to point out in the record which portions of the tape transcript it considers irrelevant, or how admission of such portions was harmful. Indeed, the only harm theorized by Ford is that any evidence that Ford officials met with former President Nixon must be considered extremely prejudicial and inflammatory because this case would thus be associated with the Watergate scandal. We do not agree. "In general, in cases of doubt as to the admissibility of evidence, where the evidence can tend to have any relevancy to the issues at hand and such evidence is not decidedly prejudicial and immaterial, it ought to be admitted, and be left to the jury to judge its significance, weight and credibility as with all other evidence in the case." *Ingle v. Swish Mfg. Southeast*, 164 Ga. App. 469, 472 (4) (297 SE2d 506) (1982). Therefore, the trial court did not err in admitting the transcript.

4. Similarly, we conclude that evidence relating to crash tests on vehicles other than the 1975 Mustang II, a composite videotape, and related exhibits and internal documents objected to by Ford as irrelevant and prejudicial were admissible within the purview of OCGA § 24-2-1, and the cases cited in Division 3c. "Admissibility of evidence is a matter which rests largely within the sound discretion of the trial court, and if an item of evidence has a tendency to help establish a fact in issue, that is sufficient to make it relevant and admissible. [Cit.]" *Lewis v. State*, 158 Ga. App. 586, 587 (1) (281 SE2d 331) (1981). Relevancy must be determined from the facts of each particular case, and we deem the trial court to have been correct here. See *Glo-Ann Plastic Indus. v. Peak Textiles*, 134 Ga. App. 924 (1) (216 SE2d 715) (1975).

The purpose of tendering earlier Pinto tests was to show that this model, from which the Mustang II evolved, had the same "failure mode" which occurred in the instant collision, thereby putting Ford on notice of the safety problem. Ford's assertions of prejudicial pre-

trial publicity in regard to the Pinto are not evidenced in the record. Likewise, crash tests and other exhibits created by Ford after the date of manufacture of the 1975 Mustang II exhibited the same characteristics of crush and collapse from rear-end impact, and also showed Ford's knowledge of the hazard at a point in time prior to the collision in which Terri Stubblefield was fatally injured.

After viewing the composite videotape in advance of trial to provide Ford's counsel the opportunity to challenge its authenticity, the trial court ruled it admissible if a proper foundation was laid. A foundation was laid for each segment of the tape outside the presence of the jury, and it was then presented to illustrate the dynamics of a typical post-collision, fuel-fed fire to substantiate the testimony that the fire in issue was "typical." Other segments were displayed to aid the jury in understanding Mr. Arndt's testimony about what these tests demonstrated. A fuel tank shield which was not developed and used until 1978 was identified only as an *example* of such a safety device.

All of these exhibits were relevant to the issue of Ford's continuing negligence in regard to its knowledge of the safety hazard, its failure to warn the public of the danger and its continued marketing of the dangerous product, as well as to the issue of callous disregard upon which basis punitive damages were sought. *Skil Corp. v. Lugsdin,* 168 Ga. App. 754 (1) (309 SE2d 921) (1983). "It follows that, where evidence is pertinent and admissible, it can not be excluded merely because it tends to damage or impair the cause of the party against whom it is being introduced. Since a party is entitled to plead a material matter, the fact that proof of it would be prejudicial does not render the evidence inadmissible." *Ludwig v. J. J. Newberry Co.,* 78 Ga. App. 871, 874 (1(a)) (52 SE2d 485) (1949). "Evidence of other transactions or occurrences is admissible if it is relevant to the particular instance and does not place too great a danger of undue consumption of time, confusion of issues, undue prejudice or unfair surprise. [Cits.]" *Charles Parrott & Assoc. v. Hunt,* 167 Ga. App. 106, 109 (2) (305 SE2d 879) (1983).

5. Nor do we agree that certain excerpts from the trial court's charge constituted an expression of its opinion. The record reflects that upon Ford's objections, the court changed the charges as requested by Ford, and that the jury was specifically instructed that nothing the court had said or done should be construed as an expression of opinion by the court. " 'A charge of a correct principle of law applicable to the case on trial does not constitute error requiring the reversal of the case as an expression of an opinion of what has been proved, under [OCGA § 9-10-7], where the whole charge when construed together shows that the matters assumed to be proven in the charge complained of were left to the jury on the question of whether

or not such facts had been established by the evidence.' [Cit.]" *First Fed. Savings &c. Assn. v. Commercial &c. Ins. Co.*, 115 Ga. App. 756, 760 (2) (156 SE2d 101) (1967).

6. Ford complains that the form of the verdict submitted to the jury effectively compelled them to award exemplary damages for appellees if they found aggravating circumstances. The interrogatory form objected to provided as follows: "Do you find from the evidence that the conduct of Ford Motor Company was attended by such aggravating circumstances as to show a conscious indifference to the consequences so that the plaintiff, William O. Stubblefield, as Administrator of the Estate of Terri J. Stubblefield, is entitled to recover additional or exemplary damages to deter Ford Motor Company from repeating such conduct? . . . If your answer is 'yes,' what amount do you find to be sufficient to keep Ford Motor Company from repeating such conduct?" Specifically, Ford asserts that the language "is entitled" contravenes the discretionary wording of OCGA § 51-12-5 that "the jury *may* give additional damages." (Emphasis supplied.) We do not think this question erroneously persuaded the jury that they had no choice but to award punitive damages, particularly when read in context with the entire verdict form. Moreover, as conceded by Ford, the jury was correctly instructed on the circumstances under which OCGA § 51-12-5 authorizes an award of additional damages, and the wording of the interrogatory was not inconsistent with those principles.

7. Ford urges that the award of $8 million as punitive damages to William O. Stubblefield as administrator of the estate of Terri J. Stubblefield was so shockingly excessive and so resulted from the bias and prejudice of the jury that the trial court abused its discretion by denying Ford's motion for a new trial on this ground. Ford argues that no appellate court in any jurisdiction has ever approved an award of this magnitude in any personal injury suit arising out of a manufacturer's negligence.

We note initially that while there was a wrongful death award made to the mother, punitive damages are not available in a wrongful death claim, *Truelove v. Wilson*, 159 Ga. App. 906, 907 (2) (285 SE2d 556) (1981), since the Georgia statute (OCGA § 51-4-1 (1); see also OCGA §§ 51-4-4; 19-7-1), to the extent it permits recovery of more than the actual loss to the survivor, is itself punitive. *Engle v. Finch*, 165 Ga. 131, 134 (139 SE 868) (1927); *Savannah Elec. Co. v. Bell*, 124 Ga. 663, 668 (4) (53 SE 109) (1905); *Roescher v. Lehigh Acres Dev.*, 125 Ga. App. 420 (188 SE2d 154) (1972); *Collins v. McPherson*, 91 Ga. App. 347, 351 (2(a)) (85 SE2d 552) (1954). However, Ford does not dispute the mother's award and we are dealing here only with the exemplary damages sought by the administrator of the estate in connection with the injuries, pain and suffering of the deceased minor

child, which may be awarded by the jury under OCGA § 51-12-5 "where there are aggravating circumstances either in the act or in the intention." *Colonial Stores v. Fishel*, 160 Ga. App. 739, 742 (3) (288 SE2d 21) (1981). In this connection, "[w]here a plaintiff pleads and proves actual pecuniary loss for which he or she seeks compensatory damages, and the tort complained of is of such an aggravated nature to warrant a charge on punitive damages [OCGA § 51-12-5], it is permissible for the jury to award both compensatory damages for the injury done and additional or punitive damages to either compensate for wounded feelings or to deter the defendant from similar, wrongful conduct." *Woodbury v. Whitmire*, 246 Ga. 349, 351 (3) (271 SE2d 491) (1980). "In such cases the award is not measured as compensation, but is fixed in *an amount necessary to deter future acts*. The rule which requires the amount of punitive damages to evidence a reasonable proportion to the extent of the injury applies to exemplary damages for wounded feelings. [Cit.] The amount, as measured by the enlightened conscience of an impartial jury, which would be required to deter future acts necessarily depends upon the facts of the particular case." *Smith v. Milikin*, 247 Ga. 369, 371-372 (3) (276 SE2d 35) (1981). (Emphasis supplied.)

The evidence here was sufficient to authorize the jury to find that the sum of $8 million was an amount necessary to deter Ford from repeating its conduct; that is, its conscious decisions to defer implementation of safety devices in order to protect its profits. One internal memo estimated that "the total financial effect of the Fuel System Integrity program [would] reduce Company profits over the 1973-1976 cycle by $(109) million," and recommended that Ford "defer adoption of the [safety measures] on all affected cars until 1976 to realize a design cost savings of $20.9 million compared to 1974." Another Ford document referred to a $2 million cost differential as "marginal." "Unless a jury verdict is palpably unreasonable or excessive, or the product of bias, it will not be disturbed on appeal. OCGA § 13-6-4 . . . [Cits.]." *Thompson Enterprises v. Coskrey*, 168 Ga. App. 181, 186 (3) (308 SE2d 399) (1983). "In discussing when a verdict may be found so excessive as to infer undue bias or prejudice, courts have said such a verdict must 'carry its death warrant upon its face,' be 'monstrous indeed,' 'must shock,' or 'appear exorbitant.' *Fields v. Jackson*, 102 Ga. App. 117, at 122 (115 SE2d 877) (1960). It is also true in considering excessiveness that an appellate court '. . . does not have the broad discretionary powers invested in trial courts to set aside verdicts, and where the trial court before whom the witnesses appeared had the opportunity of personally observing the witnesses . . . has approved the verdict, this court is without power to interfere unless it is clear from the record that the verdict of the jury was prejudiced or biased or was procured by corrupt means.' [Cit.]

The excessiveness of the verdict was raised below on motion for new trial and overruled by the judge who had presided over the . . . trial. As said in *Adkins v. Williams*, 23 Ga. 222, 224 (1857), 'The Court below, did not think the damages excessive. And the Court trying the case, must receive more light on the question of excessive damages, than it can impart to any other Court.' Considering all of the circumstances in this case, we do not find the trial court erred in declining to find the verdict excessive." *Smith v. Milikin*, supra at 372.

8. Ford contends that the trial court erred by charging the jury that attorney fees and expenses of litigation might be awarded if Ford were found to have been stubbornly litigious or to have caused the appellees unnecessary trouble and expense. Ford also contends that the trial court erred by submitting this issue to the jury and further contends that the resulting award of attorney fees was excessive and unsupported by the evidence.

(a) The trial court instructed the jury: "Attorney's fees and the expenses of litigation may be awarded where the defendant has acted in bad faith in the transaction and dealings out of which the cause of action arose, or has been stubbornly litigious or has caused plaintiffs unnecessary trouble and expense." The trial court's charge was predicated upon and substantially quoted the provisions of the statute authorizing recovery of expenses of litigation, OCGA § 13-6-11, as it has been applied by the case law. However, Ford contends that there was no evidence to support an award of litigation expenses on two of the grounds charged — stubborn litigiousness and causing unnecessary trouble and expense — and argues that appellees conceded as much at trial by stating that their claim for litigation expenses was based upon the ground of bad faith. Thus, Ford contends the trial court erred by giving a charge that was, at least in part, inapplicable.

We first note that to authorize a recovery for expenses of litigation, "[i]t is only necessary for the plaintiff to show that one of the three conditions required by the statute exists. [Cit.]" *Franchise Enterprises v. Ridgeway*, 157 Ga. App. 458, 460 (2) (278 SE2d 33) (1981). See *Allen v. Brackett*, 165 Ga. App. 415, 421 (3) (301 SE2d 486) (1983). It does not constitute reversible error for a charge to quote an inapplicable section of a correct statement of the law, " ' 'unless it further appears that the inapplicable part was calculated to mislead the jury and affect their verdict erroneously, or unless it should appear that the inapplicable part prejudiced the rights of the complainant.' [Cit.] In the instant case, it would appear that '[t]he excerpt complained of could not have been prejudicial inasmuch as the court was stating a principle of law in the abstract . . .' [Cit.]" *Habersham Mem. Park v. Moore*, 164 Ga. App. 676, 681-682 (5) (297 SE2d 315) (1982). See also *Adams v. Cowart*, 224 Ga. 210, 214 (5) (160 SE2d 805) (1968).

(b) The jury may allow expenses of litigation including attorney fees where the defendant has acted in bad faith in the transaction out of which the cause of action arose. *Smith v. Milikin,* supra at 371; *Ponce de Leon &c. v. DiGirolamo,* 238 Ga. 188, 190 (2) (232 SE2d 62) (1977). The evidence in the instant case amply authorized an award of litigation expenses on this basis as Ford was shown to have actual knowledge before the sale of a defect in its product from which it could have reasonably foreseen injury of the specific type sustained here. See *Windham v. Winters,* 148 Ga. App. 861 (253 SE2d 247) (1979); *Clark v. Aenchbacher,* 143 Ga. App. 282 (2) (238 SE2d 442) (1977); *Thibadeau Co. v. McMillan,* 132 Ga. App. 842, 843 (2) (209 SE2d 236) (1974). Ford's own documents disclosed its knowledge that if certain automobiles were struck from the rear they would burn, with a strong probability of resulting injury to the occupants; nevertheless, Ford management decided not to correct this defect or warn the owners of the danger created thereby. The evidence further authorized a finding that Ford weighed the costs of corrective action against the benefit of profits and deliberately decided to market the 1975 Mustang II with clear knowledge of the danger. Thus, we note that the same evidence which authorized the verdict for punitive damages — that Ford had actual knowledge before the sale of the automobile of a condition presenting a danger to users — also authorized the jury to find that Ford acted in bad faith in placing such a vehicle in the channels of commerce. *DiGirolamo,* supra. The trial court did not err in submitting the issue of bad faith to the jury. *Ga.-Car. Brick &c. Co. v. Brown,* 153 Ga. App. 747, 749 (2) (266 SE2d 531) (1980); *Windham,* supra at 862. We have carefully examined the expert testimony and find that the amount of the award of attorney fees and expenses was based on and supported by competent and sufficient evidence, and we will not disturb it. See *Ken-Mar Constr. Co. v. Bowen,* 245 Ga. 676 (266 SE2d 796) (1980); *Hall v. Robinson,* 165 Ga. App. 410, 411 (2) (300 SE2d 521) (1983). We find no grounds for reversal for any reason assigned.

*Judgment affirmed. McMurray, C. J., and Deen, P. J., concur.*

DECIDED JUNE 13, 1984 —
REHEARING DENIED JUNE 26, 1984 — ▮

Ben L. Weinberg, Jr., John E. Talmadge, M. Diane Owens, for appellant.

Foy R. Devine, Albert Sidney Johnson, Irwin W. Stolz, Jr., Wade H. Watson III, Seaton D. Purdom, for appellees.