Kimberly Eugene **ARGO** and Anna Argo, **Plaintiffs,**

v.

**PERFECTION PRODUCTS COMPANY,**
et al., **Defendants.**

Johnny **MORELAND, Plaintiff,**

v.

**PERFECTION PRODUCTS COMPANY,**
et al., **Defendants.**

**Nos. 1:87–cv–201–CAM,
1:87–cv–402–CAM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

May 30, 1989.

David Warren Griffeth, Office of David Warren Griffeth, Athens, Ga., James C. Wirken, Louis C. Accurso, Spradley Wirken Riesmeyer & King, Kansas City, Mo., for plaintiff Johnny Moreland.

James Thompson McDonald, Jr., Swift Currie McGhee & Hiers, Atlanta, Ga., for defendants Perfection Products Co., White Consol. Industries and Schwank, Inc.

Robert W. Patrick, Powell Goldstein Frazer & Murphy, Daryll Norman Love, Allen S.C. Willingham, Love & Willingham, Atlanta, Ga., for defendant Petrolane Gas Service, Inc.

Glenn H. Frick, Lokey & Bowden, Savannah, Ga., for defendants Johnson Controls, Inc., John Doe Mfg. Co., II and John Doe LP Gas Supply/Distribution Co.

## ORDER OF COURT

MOYE, Senior District Judge.

The above-styled cases are before this court on the following motions:

(1) motion for reconsideration of Magistrate Harper's order of November 28, 1988 by plaintiffs Argo;

(2) motion for summary judgment and alternative motion for partial summary judgment by Petrolane Gas Service ("Petrolane");

(3) motion in limine and motion to strike by defendant Petrolane;

(4) motion for summary judgment by defendants Schwank, Inc. ("Schwank"), Perfection Products ("Perfection"), and White Industries, Inc. ("White");

(5) motion in limine by defendants Perfection, Schwank and White;

(6) motion for summary judgment by defendant Johnson Controls, Inc. ("Johnson Controls").

For the reasons set forth below, the court GRANTS Johnson Controls's, Schwank's, Perfection's, and White's motions for summary judgment, DENIES as moot Perfection's, White's, and Schwank's motions in limine, DENIES the motion by the Argo plaintiffs for reconsideration of Magistrate Harper's order of November 28, 1988, and DEFERS ruling on Petrolane's motions for summary judgment and partial summary judgment pending oral argument at a date to be set by the court on the issues raised by those motions and the plaintiffs' responses thereto.

### Statement of Facts

This case involves injuries sustained by plaintiffs Kimberly Eugene Argo and Johnny Moreland on February 7, 1985 at the CertainTeed Corporation Plant in Athens, Georgia. CertainTeed is a corporation which manufactures fiberglass. Its Athens, Georgia facility consists of two divisions—the A–11 plant, where Mssrs. Argo and Moreland worked, and the bonded mat plant which is adjacent thereto. The plaintiffs were injured when, in an attempt to light a liquid propane gas heater (housed in an enclosed trailer), Mr. Argo flicked his lighter, causing an explosion by igniting liquid propane gas which had accumulated in the trailer.

The product which is the subject of this lawsuit is the Perfection Infrared Portable Heater Model No. PJ137–AL manufactured by defendant Perfection Products. The heater was an industrial heater [1] being used in a trailer on the grounds at the CertainTeed plant to keep glue, which was stored at the plant's loading docks, from becoming exposed to the cold and therefore freezing.[2] The Perfection heater contained as a component part a gas control safety device manufactured by Johnson Controls. The control is known as a BASO Valve Series H–17. Johnson Controls sells its H–17 valves to original equipment manufacturers usually in units ranging from 72 to 100 per carton. (Faland depo. at 30). The valves are accompanied with product information, specification and installation instructions. (Hajny depo., p. 62; Faland depo., pp. 31, 72, 73; DeAngelis depo., pp. 44, 124). These instructions have been approved by the American Gas Association. (DeAngelis depo. at 69). Johnson Controls sells its H–17 valve to many original equipment manufacturers, and it is left to the discretion of the particular manufacturer as to how and where the H–17 valve is used in the manufacturer's equipment. (DeAngelis depo. at 39). Not all of Johnson Contols's H–17 valves are located and installed as on the Perfection heater. Some manufacturers recess the valve into the appliance with little or no opening or exposure. (Hajny depo. at 117). The main purpose of the valve is to permit a small burner appliance to be operated through a thermocouple. The thermocouple is electrically ener-

---

1. Perfection sells its infrared portable construction heaters of the type at issue in this lawsuit to commercial and industrial users only. The heaters are not for residential use. *See* Zimmerly depo. at 70; Neises depo. at 22.

2. *See* Exhibit H to Johnson Controls's Brief in Support of Motion for Summary Judgment which is a copy of a note written in large capital letters which Mr. Argo testified he had seen posted on the "warehouse office door or wall." Argo Depo. at 142. The note states: "TO ALL SUPERVISORS: BE SURE THAT HEATERS IN TRAILERS CONTAINING GLUE AT DOCKS 3 & 5 ARE *ON* WHEN TEMP. IS 32 [DEGREES] OR LOWER. DAY SHIFT BE SURE FUEL TANKS ARE FULL." (emphasis in original)

gized to hold open a magnet which holds open the valve through which gas can flow to the burner.

The Perfection heater at issue in this case operates like a gas grill—it must be manually ignited before each use. It is not equipped with a constantly burning pilot light and does not employ an automatic temperature sensing device such as a thermostat to switch itself off and on. Therefore, each time the heater is lit, the safety control button must be depressed for 60 seconds.

To start the Perfection heater, one must punch the red reset button (the safety control button) which opens the valve to allow the flow of liquid propane ("LP") gas fuel to the burner. Simultaneously, the person lighting the heater must hold a lighted match or other ignition source to the burner tip. The heat from the burner is supposed to be communicated through a thermocouple wire connected to a magnetic coil in the gas control valve. When hot enough, the thermocouple wire causes the magnetic coil to hold the gas valve open, thereby allowing gas to continue to flow to the burner without the operator having to hold down the reset button. The gas valve performs a safety function because if the flame on the burner goes out, the thermocouple wire cools, causing the magnetic coil to close the gas valve and stop the flow of gas to the burner. The gas control is thus referred to as a 100% safety shut-off device; its basic function is to interrupt the flow of gas to the main burner when there

is no source of ignition or heat. (DeAngelis depo. at 34, 48).

Thus, to recapitulate, the Johnson Controls H–17 valve has two functions. First, it acts as a primer to allow the flow of gas during the lighting of the heater until such time as the thermocouple controlling (by electrical impulse) the valve has reached a sufficient temperature to hold the valve open. Second, in the event the flame becomes extinguished and the thermocouple cools (and is no longer capable of keeping the valve open), the valve shuts off and prevents the flow of gas.

In the incident which occurred on February 7, 1985, the reset button on the safety shut-off device was *taped down in the open position* so that it could not perform its intended safety function. The taping down of the button allowed gas to continue to flow even when there was no source of flame. The evidence indicates that it was common practice at the CertainTeed plant in Athens to operate LP gas heaters with the reset buttons taped down. *See, e.g.,* Deposition of Roy Thomas, warehouse supervisor, pp. 17–37.[3] Mr. Thomas also testified that people in management positions at CertainTeed knew that the safety button on the heaters were taped down. *Id.* at 50.[4]

As stated above, Perfection Products sells its infrared heaters to commercial and industrial users only. The heaters are shipped with instructions for operating and maintaining the heaters, including warnings, and a troubleshooter checklist. Perfection heaters and the accompanying in-

---

**3.** Mr. Thomas testified: "... I had been told by numerous maintenance people when I was warehouse manager that it was okay for the button to be taped down because it was there for us, you know, to shut it off and that, you know, you could run it with the button shut down ... [A]s a matter of fact, our maintenance people would tape them down when they put them together. They would come to us in the warehouse already taped down." Thomas depo. at 37.

**4.** As of the date of the accident, there were sixteen heaters in use at the plant, and fifteen of these heaters had the red button on the safety valve taped down. Mr. Gene Clark, supervisor of Argo and Moreland, was aware that most, if not all, of the heaters had the red button taped

down. (Clark depo. at 31–32). According to Clark, who had been with CertainTeed for eleven years, the buttons on the valves had been taped down on nine out of ten heaters for as long as he could remember. (Clark depo. at 62). The testimony of Mr. Jerry Whitlock, a lead maintenance man at CertainTeed at the time of the accident, Mr. William Witcher, maintenance mechanic at CertanTeed at the time of the accident, Mr. Kenneth Baxter, maintenance supervisor at the time of the accident, and Mr. Don Braswell, maintenance planner at CertainTeed, indicates that the taping down of the buttons on the safety valves was widespread. *See* Whitlock depo. at 11–12, 18, 20, 23–24; Witcher depo. at 7; Baxter depo. at 46; Braswell depo. at 30, 37–39, 48–49.

structions meet all applicable standards in the gas appliance industry. The lighting instructions contained both in the information sent with each unassembled heater and *on the heater itself* state:

Consult lighting instruction label on heater. Refer to figures 1 and 2. (1) Open tank valve or manual line and Heater manual valve (Item A, Figure 1). (2) Depress red button (Item B, Figure 2) on safety valve, and ignite Heater through lighting port (Item C, Figure 1) with a match or taper. (3) If Heater fails to light within ten seconds, release red button, check fuel supply, wait five minutes, and then repeat steps 1, 2 and 4. (4) Release red button after sixty seconds. (5) To shut down Heater, close manual valve (Item A, Figure 1) and either the tank valve or the manual line valve.

*CAUTION:*

Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance. Heater must be properly installed and positioned before use. Clearances shown in Table II must be maintained. Do not move, handle or service while Heater is operating or hot.

Additional instructions accompanying the heaters warned against using the heaters in enclosed areas without proper ventilation. *See* Exhibit D–1 to Argo depo., "Installation and Operating Instructions, Perfection Gas–Fired Construction Heaters", at 1 ("When used indoors or in confined areas, adequate ventilation must be provided. Consult the Ventilation Requirements section of this manual.")[5]

Prior to the accident involving the plaintiffs, the head of the Safety Committee at CertainTeed, Doreen Rachor, and the Plant Manager of both divisions, Charles Harper, knew that the red buttons on the heaters in the bonded mat division of CertainTeed had been taped down. Realizing the danger of this practice, they posted a notice on the bulletin board of the bonded mat plant warning employees not to tape the buttons down and discussed the same in a safety meeting at the bonded mat plant. The testimony is conflicting as to whether the employees in the A–11 plant knew of the notice and the danger of which it warned. It is clear however that Charles Harper, who managed both divisions, and who knew of the unsafe practice prevalent at CertainTeed with respect to the taping down of the buttons on the heaters, failed to take the necessary steps to ensure that the buttons on *all* heaters at CertainTeed were not being taped down.[6]

The sequence of events leading to the accident are as follows: On the afternoon of February 7, 1985, a new trailer containing 55–gallon drums of glue arrived at the loading dock at CertainTeed. (Ledford depo., at 36–37; Brown depo. at 23). Mr. Danny Atkins, a CertainTeed employee, was at the loading dock when the new trailer of glue arrived. Mr. Kime Temples, a supervisor, asked Atkins to put the Perfection heater in the trailer to keep the glue warm. Atkins told Temples that he did not believe it was a good idea to put the heater in the trailer, and that he was not going to do it. (Atkins depo. at 12). Atkins's thought that it was unsafe to put propane heaters in an enclosed trailer and he expressed this concern to Temples. (Atkins depo. at 13). Atkins believed it was dangerous to put the heater in the trailer with the doors closed because all of the oxygen would be burned up, and an explo-

---

5. Perfection claims, and plaintiffs do not contradict, that Perfection enclosed instructions with each heater it sold.

6. According to Ms. Rachor, who investigated the accident, there were a number of reasons why employees would tape the safety buttons down. One is that there were no spare parts for broken thermocouples and by taping the buttons down, employees avoided the inconvenience of having to give their heaters up for repair when it was cold. Rachor depo. at 125–26. Second, the valve would cut off the flow of gas if the heaters were moved. By taping the button down, employees enabled themselves to move the heaters without having to relight them. *Id.* at 128. And third, the ignition process was cumbersome. The red button had to be depressed for sixty seconds in order to light the heater. According to Ms. Rachor: "They didn't want to wait. For whatever reason, they felt like they could do it quicker with the valve open and the gas already coming through. They just didn't want to wait." *Id.*

sion might ensue. (Atkins depo. at 19–20). Despite the risk, the heater was placed in the unventilated trailer, possibly by Cornelius Brown, a warehouser at the plant. (Brown depo., at 24–25; Ledford depo. at 25–26). It is not known whether somebody filled a new gas tank for use with the heater or whether a spare tank that had been filled earlier was used. (Ledford depo. at 25–26; Brown depo. at 52). The tank from which the gas escaped has not been located.

The heater was checked by Brown at some point after 4 p.m. that day and was still burning. (Brown depo. at 49–50). Approximately one hour before the explosion, Terry Echols, a warehouser, entered the trailer, noticed the heater was out, but did not tell anyone. (Echols depo. at 36–39). He did not smell any gas or other odors. (Echols depo. at 22–23).

At approximately 7:15 p.m. Ernest Clark, a warehouse supervisor, instructed Moreland, a warehouser in charge of keeping the heaters at the plant burning, to check the trailer to see that the heaters were going. (Clark depo. at 19). Moreland, without stepping in, looked into the trailer and saw that the heater was not burning. (Moreland depo. at 75–80). As he prepared to enter the trailer to light the heater, he called to Argo and asked if he could borrow Argo's lighter. (Argo depo. at 75). Argo walked over to Moreland to give Moreland his lighter. (Moreland depo. at 82–85). Moreland stepped into the trailer first, and Argo followed immediately behind him. (Argo depo. at 76). Argo reached into his pocket and pulled out his lighter "right after" he got in the trailer. Argo flicked his lighter to test it and the explosion occurred. (Argo depo. at 76–77). According to Moreland, "everything happened so quickly." Moreland depo. at 86. According to Moreland, they entered the trailer, and suddenly found themselves engulfed in a large rolling flame. *Id.* Neither Argo nor Moreland was sniffing for gas as he

entered the trailer and neither smelled gas. (Moreland depo. at 89; Argo depo. at 79).[7]

After the accident, the heater and the valve were tested, and according to every expert, including an expert hired by the Argo plaintiffs, the valve functioned properly as it was designed to do. As Mr. Thomas Crane, an expert hired by the Argo plaintiffs, testified:

Flow through the control was evaluated in the safety off or button up position with the orifice within a glass container of water to observe flow resulting from bubbles formed at the orifice. This test verified the safety shut-off valve was functioning and resulted in no flow through the valve with the safety button released.

Crane's "Field Notes", Exhibit D–1 to Crane's depo., p. 2.

Also following the accident, Noreen Rachor, head of the Safety Committee at CertainTeed, conducted an investigation of the explosion and found:

The two major contributing factors in the accident were:

1) The portable propane heater was not used according to operating instructions. It was placed in a confined space without proper ventilation to support combustion and

2) The safety switch, which was an electrically controlled shut-off valve, had been bypassed with tape in the open position.

Oxygen was depleted in the trailer, and the heater went out. With the safety valve bypassed, gas continued to flow into the unventilated trailer. When Johnny [Mr. Moreland] went into the truck, enough oxygen was reintroduced to support ignition, and when he struck the lighter, fire resulted.

Report of Noreen Rachor, dated February 26, 1985, attached as Exhibit F (at hand-numbered pages 6–7) to Johnson Controls's Motion for Summary Judgment.

---

7. The court notes that after the accident, the heater was taken to the office of Ms. Noreen Rachor. The day after the accident, she came into her office and noticed a distinct gas smell which she described as a stale, skunk-like odor. Rachor depo. at 68–70, 159. The heater was then moved into a conference room. Danny Atkins has testified that he smelled propane in the conference room. Atkins depo. at 54–57.

The plaintiffs, barred from suing CertainTeed under O.C.G.A. § 34–9–11, have sued Johnson Controls, the manufacturer of the valve, Perfection Products, the manufacturer of the heater, and Petrolane, the distributor of the liquid propane gas. The plaintiffs' claims against the manufacturing defendants sound in strict liability and negligence for allegedly selling a defective product and/or negligently designing the valve mechanism to allow flow of gas after a flame has been extinguished and failing to adequately warn and instruct users against such known dangers. The plaintiffs' claims against Petrolane also sound in strict liability and negligence. The primary aspects of the plaintiffs' complaints against Petrolane involve a failure to warn as well as failure to adequately odorize the liquid propane gas which exploded at the CertainTeed plant.

## Legal Discussion

Each of the defendants in this case has moved for summary judgment. Before discussing the merits of the defendants' motions, the court wishes to set forth the applicable standards for deciding motions for summary judgment.

### A. Summary Judgment Standard

■ Federal Rule of Civil Procedure 56 *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir.1988). "In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018,

1022 (11th Cir.1988), *quoting Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. at 2552.

■ The movant bears the "initial responsibility" of asserting the basis of his motion. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. The movant is not required to negate his opponent's claim. *Id.* at 323, 106 S.Ct. at 2552. Rather, the movant discharges his burden by "showing —that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2554.

■ After the movant has carried his burden, the non-moving party is then required "to go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. While this evidence need not be in a form that would be admissible at trial,[8] *id.*, "it must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 581, 106 S.Ct. 1348, 1353, 89 L.Ed.2d 538 (1986); *Samples v. City of Atlanta*, 846 F.2d 1328, 1331 (11th Cir. 1988). And though the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples*, 846 F.2d at 1331, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original); *Brown*, 848 F.2d at 1537. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Similarly, a fact is not material un-

---

**8.** That is, the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Ross v. Bank South*, 837 F.2d 980, 984 (11th Cir.1988). General competency rules are still applicable, however. *United States v. Dairyland Ins. Co.*, 644 F.Supp. 702, 708 (N.D.Ga.1986); *Tarbutton v. Holley*, 641 F.Supp. 521, 524 (M.D. Ga.1986); *Sanders v. Nunley*, 634 F.Supp. 474 (N.D.Ga.1985).

less it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to his case so as to create a genuine issue for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Brown*, 848 F.2d at 1537.

**B. Schwank's Motion for Summary Judgment**

Defendant Schwank, Inc. has been dismissed as a defendant in the *Argo* case, Civil Action No. 1:87–cv–201–CAM, but remains as a defendant in the *Moreland* case, Civil Action No. 1:87–cv–402–CAM. As Schwank did not participate in the manufacture or sale of the product at issue in this case, it cannot be held liable to the plaintiff Johnny Moreland.

It is undisputed that at the time the heater at issue in this case was manufactured, it was manufactured by Perfection Products Company as a division of White Consolidated Industries, Inc. Subsequent to the sale of the infra-red heater by Perfection,[9] White sold Perfection to Schwank.[10]

■ As a general rule, a successor corporation which purchases the assets from another corporation does not assume the liabilities of the predecessor corporation. *Carswell v. National Exchange Bank,* 165 Ga. 351, 140 S.E. 755 (1927); *see also Bullington v. Union Tool Corp.,* 254 Ga. 283, 328 S.E.2d 726 (1985). *Bullington* sets forth the four exceptions to the traditional rule of no liability: (1) there is an agreement to assume liability; (2) the transaction was a fraudulent attempt to escape liability; (3) the purchaser is a mere continuation of the predecessor corporation; (4) the transaction is actually a de facto merger. *Id.* at 284, 328 S.E.2d 726.

■ In the instant case, the record reflects that White sold to Schwank assets consisting of the Perfection Products Company. After the sale of the Perfection division to Schwank, both White and Schwank continued to operate as independent and separate entities. Shaver depo. at 93. Thus, White's sale of Perfection to Schwank involved neither a merger nor the mere continuation of a predecessor corporation. The plaintiff, Mr. Moreland, has failed to point this court to one scintilla of evidence indicating that the sale of assets included either an agreement by Schwank to assume liabilities or that the sale constituted a fraudulent attempt to avoid liability. Therefore, the court, under the authority of the *Carswell* and *Bullington* cases, hereby GRANTS Schwank's motion for summary judgment in the *Moreland* case.

**C. Perfection's [11] and Johnson Controls's Motions for Summary Judgment**

The plaintiffs allege that Perfection and Johnson Controls should be held liable under theories of negligence and strict liability for selling a defective product. Section 51–1–11(b)(1) of the Georgia Code provides the cause of action for strict liability in tort:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

Georgia courts have recognized that in a product design case like the one at bar,

---

9. The heater at issue in this case was sold by Perfection on January 14, 1981 to Southern Infra-red Engineering Company. *See* Shaver depo. at 78–79.

10. Perfection became a division of Schwank on August 1, 1981. Shaver depo. at 91.

11. The court hereinafter will refer to the motions of Perfection and White as Perfection's motions.

only semantics distinguishes the cause of action for negligence from the cause of action for strict liability. *Coast Catamaran Corp. v. Mann*, 171 Ga.App. 844, 848, 321 S.E.2d 353 (1984). The ultimate question, whether sounding in negligence or strict liability is the same—was the gas control defective, and, if so, did the defective product proximately cause the plaintiffs' injuries?

■ There is no dispute that the gas control, when tested (with the tape removed) after the explosion, worked as it was designed to work. *See* Crane depo. at 14; Flanigan depo. at 18. Thus, when used in its normal, unadulterated state, the gas control valve functioned properly. Under Georgia law, a product is not in a defective condition when it is safe for normal handling. If injury results from abnormal handling, the manufacturer is not liable. *Center Chemical Co. v. Parzini*, 234 Ga. 868, 869, 218 S.E.2d 580 (1975); *Barnes v. Harley–Davidson Motor Co., Inc.*, 182 Ga. App. 778, 781, 357 S.E.2d 127 (1987). As the Georgia Supreme Court stated in *Parzini, supra*, (quoting from the Second Restatement of Torts, § 402A, comment h):

"A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling ... the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use ... he may be required to give adequate warnings of the danger ... and a product sold without such warning is in a defective condition."

*Id.*, 234 Ga. at 869–70, 218 S.E.2d 580 (omissions in original).

■ Thus, this case turns on whether the circumvention of the safety device was reasonably foreseeable by the manufacturers and whether the manufacturers adequately warned of the dangers posed by the heater. Under Georgia law, "[f]oreseeability means that which it is objectively reasonable to expect, not merely what might occur." *Greenway v. Peabody In-*ternational Corp.*, 163 Ga.App. 698, 704, 294 S.E.2d 541 (1982) (citation omitted). The plaintiffs allege that the valve is defective because the safety shut-off mechanism can be easily circumvented. Crane depo. at 40. The plaintiffs allege that the defendants should have reasonably foreseen such circumvention and explicitly warned against such danger or manufactured a valve that could not be defeated so easily.

Johnson Controls and Perfection claim that the products (both the valve and the heater) were not defective when sold; the products were supplied with the necessary instructions and information; the employees at CertainTeed misused and altered the product; and the manufacturers could not have foreseen nor anticipated that misuse of the valve would occur.

The evidence indicates that in the almost forty years that Johnson Controls has been making the H–17 valve, nothing like this incident has ever occurred. Hajny depo. at 124; DeAngelis depo. at 84; Zimmerly depo. at 92; Shaver depo. at 82, 89, 110; Neises depo. at 77; Weaver depo. at 75; Bissell depo. at 59–60; Willert depo. at 63, 150. In the words of Mr. Charles Hajny, supervisor of research and development in engineering and supervisor of design engineering at Johnson Controls until 1976, "I have never heard of one of these causing a problem with the millions and millions that were made. Tens of millions." Hajny depo. at 118.[12] In the words of Mr. Joseph Neises, sales manager and president of Infrared Division of Perfection, "In all the years that Johnson has used this valve, that we have used this valve, this is the only incident that we know about." Neises second depo. at 58. The plaintiffs have produced no competent evidence to refute the defendants' claims.

Under Georgia law, "neither a manufacturer nor a seller is an insurer that his product is, from a design viewpoint, incapable of producing injury ... [This] rule is grounded on the proposition that virtually any article is capable of causing an injury

---

12. Mr. Hajny now serves as a consultant to Johnson Controls and holds approximately twenty patents for control devices.

when put to particular uses or misuses." *Coast Catamaran v. Mann,* 171 Ga.App. 844, 847, 321 S.E.2d 353 (1984), *aff'd,* 254 Ga. 201, 326 S.E.2d 436 (1985).

The plaintiffs' assertion that the valve should have been made more safe is effectively answered by a series of Georgia court cases, a recent example of which is the Georgia Court of Appeals's decision in *Honda Motor Co., Ltd. v. Kimbrel,* 189 Ga.App. 414, 376 S.E.2d 379 (1988). In the *Honda Motor* case, plaintiffs were injured in an automobile accident while riding in a Honda automobile. The Honda automobile was equipped with manual three point lap and shoulder belts with an audible buzzer. The car did not have airbags. The plaintiffs were not wearing their seat belts when the accident occurred. Plaintiffs alleged that it was foreseeable that users of such vehicles would not utilize "active" occupant protection in the form of seatbelts and that the automobile was defective because, although Honda possessed the technology to incorporate passive restraints in the form of airbags, it did not do so. The court stated that "the threshold issue is whether the absence of passive restraints or airbags can be considered a defective condition so as to establish a breach of duty on the part of Honda Motors … The answer is no." *Id.* at 419, 376 S.E.2d 379 (citations omitted). *See also Orkin Exterminating Co., Inc. v. Dawn Food Products,* 186 Ga.App. 201, 202, 366 S.E.2d 792 (1988) ("a manufacturer has no duty so to design his product as to render it wholly incapable of producing injury"); *Greenway v. Peabody International Corp.,* 163 Ga. App. 698, 704, 294 S.E.2d 541 (1982) (manufacturer of garbage dumpster into which small child crawled and died "cannot be held to reasonably foresee that a small child would be permitted to play in a dumpster"); *Hunt v. Harley Davidson Motor Co.,* 147 Ga.App. 44, 248 S.E.2d 15 (1978) (motorcycle manufacturer not negligent or strictly liable for failing to install "crash bars" on its motorcycles); *Fortner v. W.C. Cayne Co.,* 184 Ga.App. 187, 360 S.E.2d 920 (1987) (manufacturer not liable for failing to provide pins to keep casters in place on movable scaffolding); *Poppell v. Wa-*

*ters,* 126 Ga.App. 385, 190 S.E.2d 815 (1972) (bicycle manufacturer not liable for failure to provide front and rear reflectors on bicycle); *Stovall & Co. v. Tate,* 124 Ga.App. 605, 610, 184 S.E.2d 834 (1971) ("If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands") (citations omitted); *Coast Catamaran Corp. v. Mann,* 171 Ga.App. 844, 321 S.E.2d 353 (1984), *aff'd,* 254 Ga. 201, 326 S.E.2d 436 (1985) (manufacturer of sailboat not negligent or strictly liable for creating mast capable of conducting electricity).

The above-cited *Honda Motor, Greenway, Fortner* and *Stovall* cases establish that Georgia law does not require a manufacturer to add additional safety devices beyond the normal safety devices incorporated in a product. Georgia law does not require manufacturers to create safety devices to protect safety devices. Under the law of the state of Georgia, a manufacturer is not required to incorporate additional safety devices when the product, as it exists, is reasonably safe for the use intended. The undisputed evidence shows that the gas valve worked precisely as designed, absent the misuse of the product.

■ The evidence is also undisputed that the function of the existing safety device, the red safety button, was known to the user, CertainTeed. The instructions for safe lighting, use and maintenance of the heater accompanied every heater and were in CertainTeed's possession. CertainTeed is a sophisticated industrial user of infrared heaters—it had at least fifteen heaters in operation at its Athens facility at the time of the accident. It knew or should have known how to operate and maintain the heaters it purchased. Under Georgia law, when a product is sold to a particular group or profession, a manufacturer has no duty to warn against the risks generally known to that group or profession. *Eyster v. Borg–Warner Corp.,* 131 Ga.App. 702,

206 S.E.2d 668 (1974). The evidence shows that employees of CertainTeed understood the function of the red safety button yet allowed the safety function to be deliberately bypassed. Under these circumstances, Johnson Controls and Perfection had no duty to supply a valve to CertainTeed that contained more safety devices. *See Talley v. City Tank Corp.*, 158 Ga.App. 130, 134, 279 S.E.2d 264 (1981) ("When a manufacturer is sued ... for injuries proximately resulting from a defect in the design of his product existing at the time of sale, obviously if the design of that product has been independently altered, eliminated and replaced by a third party after the sale and injuries then result, those injuries cannot be traced to or be the proximate result of the manufacturer's original design which did not exist at the time of the injury"); *see also Georgia Power Co. v. Kinard*, 47 Ga. App. 483, 486, 170 S.E. 688 (1933) ("[W]here the evidence plainly and manifestly shows that the injury was caused by the intervening efficient act of [a] third person ..., the defendant can not be held responsible for having produced the injury, and the question is then one of law for the determination by the court, and not one of fact for the jury").

The court finds as a matter of law that the Perfection heater and the H–17 valve incorporated into the heater as a component part are not defective products under Georgia law as they were reasonably safe for the purposes intended. The court holds that no reasonable juror could find that the manufacturing defendants could have foreseen that the red automatic safety shut-off switch on the BASO H–17 valve incorporated into the Perfection infrared heater would be taped down by an industrial user so as to defeat the valve's safety function.[13] Accordingly, the court GRANTS Perfection's, White's, and Johnson Controls's motions for summary judgment.

**13.** Under Georgia law, in clear cases, a court may decide the issue of reasonable foreseeability. *See, e.g., Levangie v. Dunn*, 182 Ga.App. 439, 356 S.E.2d 88 (1987) (summary judgment affirmed); *Lewis v. Atlanta Gas Co.*, 179 Ga.App.

**D. Argo Plaintiffs' Motion for Reconsideration**

On November 28, 1988, Magistrate Harper issued an order denying the Argo plaintiffs' motion to compel Johnson Controls to answer Interrogatory No. 18 which asked:

Has this defendant been sued since 1/1/70 where plaintiff has alleged that the safety shut off control apparatus manufactured by this defendant either malfunctioned or was defective in either design or manufacture. If so, state:

a.) Describe the alleged product by make, model, name and number and type of gas utility it was used on.

b.) Full and complete description of the alleged malfunction or defect.

c.) Name and address of each plaintiff and plaintiff's attorneys.

Johnson Controls answered: "No prior suits have been filed regarding the H17 control or its predecessor control." The plaintiffs contend that such an answer, limited only to the model of valve involved in this particular explosion is an inadequate response and moved Judge Harper to compel production, a motion which he denied.

This court, having read and considered Judge Harper's Order of November 28, 1988, the Argo plaintiffs' motion for reconsideration of that order, and Johnson Controls's response to the plaintiffs' motion for reconsideration, hereby DENIES the Argo plaintiffs' motion for reconsideration and adopts Magistrate Harper's order of November 28, 1988 as the order of this court.

*Conclusion*

IN SUM, the court GRANTS Johnson Controls's, Schwank's, Perfection's, and White's motions for summary judgment, DENIES as moot Perfection's, White's, and Schwank's motions in limine, DENIES the motion by the Argo plaintiffs for reconsideration of Magistrate Harper's order of November 28, 1988, and DEFERS ruling on Petrolane's motions for summary judgment

185, 345 S.E.2d 858 (1986) (summary judgment affirmed); *Kells v. Northside Realty Associates*, 156 Ga.App. 164, 274 S.E.2d 66 (1980) (summary judgment affirmed).

**1120**

and partial summary judgment pending oral argument at a date to be set by the court on the issues raised by those motions and the plaintiffs' responses thereto.

SO ORDERED.