Jimmy T. DICKERSON, et al., Plaintiff,

v.

CUSHMAN, INC., et al., Defendants.

No. 94–D–430–S.

United States District Court,
M.D. Alabama,
Southern Division.

Oct. 12, 1995.

Lowell Landis Sexton, Blaine Celone Stevens, J. Greg Allen, LaBarron N. Boone, Montgomery, AL, for plaintiff.

Ronald G. Davenport, Robert Charles Ward, Jr., Montgomery, AL, James B. Carlson, Birmingham, AL, John S. Bowman, Jr., Sterling G. Culpepper, Jr., Donald R. Jones, Montgomery, AL, for defendants.

### *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

This matter is now before the court on three separate motions for summary judgment.[1] Defendant Tieco, Inc. ("Tieco"), filed its motion on April 21, 1995. Tieco then filed an amendment to its motion on May 5, 1995. The plaintiffs, Jimmy T. Dickerson ("Dickerson") and Matthew Hutton ("Hutton"), responded in opposition to Tieco's motion on May 12, 1995. Tieco then filed a second amendment to its motion on July 21, 1995.

Defendants Upper Midwest Industries, Inc. ("UMI"), and Kuker–Parker Industries, Inc. ("Kuker"), each filed separate motions for summary judgment on May 10, 1995. The aforementioned plaintiffs responded in opposition to each of these motions on May 30, 1995. On August 17, 1995, UMI filed a supplemental brief and evidence in support of its motion.

After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court finds that (1) Defendant Tieco's motion for summary judgment is due to be denied; (2) Defendant UMI's motion for summary judgment is due to be denied; and (3) Defendant Kuker's motion for summary judgment is due to be denied.

### JURISDICTION AND VENUE

Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 457 because the plaintiffs allege a civil action to recover damages for injuries sustained in a place subject to the exclusive jurisdiction of the United States and within the exterior boundaries of a state.

### STATEMENT OF FACTS

On May 11, 1993, Plaintiffs Dickerson and Hutton were operating a Cushman three-wheel turf truckster equipped with a Kuker 150–gallon sprayer system. The plaintiffs were spraying weeds on a slope on the Army post at Fort Rucker, Alabama. As Dickerson and Hutton were traveling west at a speed of about two miles an hour along the right-of-way of Christian Road, the subject vehicle hit a small indention about the size of a pie plate and approximately 1–2 inches deep which caused the truckster to overturn. As a result of the accident, both Dickerson and Hutton were injured.

The Cushman truckster involved in the accident was equipped with a sprayer system designed and manufactured by Kuker specifically for the Cushman three-wheel vehicle that is the subject of this lawsuit. Kuker had integrated a spray tank that was manufactured and designed by UMI into its sprayer system. Tieco, the retailer, then combined the Kuker sprayer system with the Cushman three-wheeler and sold it to the Department of the Army at Fort Rucker.

The plaintiffs base their claims against Tieco, UMI, and Kuker on three separate tort theories: the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), negligence, and wantonness. Specifically, the plaintiffs allege in Counts I and IV that defendant Tieco engineered, designed, manufactured, labeled, and sold or marketed a defective Cushman sprayer in violation of the AEMLD. The plaintiffs further contend in

---

1. There are four defendants in this case: Tieco, Inc.; Upper Midwest Industries, Inc.; Kuker, Inc.; and Cushman, Inc. The court notes that the fourth defendant, Cushman, Inc., has not filed a motion for summary judgment.

Counts II, III, V, and VI that Tieco wantonly and/or negligently designed, manufactured, tested, inspected, distributed, labeled and/or sold the Cushman sprayer. The plaintiffs next allege in Count VII that defendant Kuker violated the AEMLD for distributing, selling, and/or marketing a defective sprayer system. The plaintiffs also allege in Counts VIII and XI that Kuker was negligent and/or wanton in its design, manufacture, testing, inspection, distribution, labeling, and/or sale of the sprayer system. As to defendant UMI, the plaintiffs claim in Count X that it sold, distributed, or marketed a defective Turf Choice spray tank that was integrated into the Kuker sprayer system in violation of the AEMLD. In addition, the plaintiffs claim in Counts XI and XII that UMI wantonly and/or negligently designed, manufactured, tested, inspected, distributed, labeled and/or sold the spray tank.

The plaintiffs allege that two separate design defects contributed to the instability of the Cushman sprayer and caused it to roll over resulting in injury to the plaintiffs. First, they claim that the three-wheel design of the Cushman three-wheel truckster was unstable and unfit for its intended use as a sprayer. According to the plaintiffs, the Cushman three-wheel truckster was defective because it was not equipped with seat belts and a rollover protection structure ("ROPS"). Second, the plaintiffs claim that the spray tank designed and manufactured by UMI was unfit for its intended use as a spray reservoir. They claim that the spray tank should have been manufactured with internal baffles to prevent the free movement of liquid inside the tank. According to the plaintiffs, the absence of baffles in the spray tank made the Cushman truckster more likely to turn over because the weight of the liquid was able to shift more easily within the tank.

The plaintiffs also claim that the retailer, Tieco, caused the vehicle to become more dangerous. Namely, Tieco substituted a sprayer system with a 150–gallon spray tank for a sprayer system with a 120–gallon spray tank even though the employer of the plaintiffs had ordered a sprayer system with a 120–gallon capacity.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court has noted, on the other hand, that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. *See Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989). At the summary judgment stage, the court must construe the evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genu-

ine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (citing Fed.R.Civ.P. 56(c)).

## DISCUSSION

### *Kuker's Motion for Summary Judgment*

Defendant Kuker combined the spray tank manufactured by UMI with its own sprayer equipment and sold it as a sprayer system to Tieco. According to the testimony of Robert D. LeClaire ("LeClaire"), a former production planner and purchaser for Kuker, Kuker's sprayer system was specifically manufactured, designed, and marketed for use on the Cushman three-wheel vehicle involved in the accident. LeClaire's Dep. at 12–15, 17. Furthermore, LeClaire testified that Kuker's engineering department tested the sprayer system on the Cushman three-wheel model that is the subject of this lawsuit. LeClaire's Dep. at 21, 25–26.

Kuker does not dispute that the plaintiffs have submitted evidence that, if admissible, would require the court to deny its motion for summary judgment. Instead, Kuker attacks the admissibility of the testimony of plaintiffs' expert witness, Dr. Bryan R. Durig ("Dr. Durig"), on the basis that Dr. Durig is unqualified to issue an expert opinion on mobile tank design.

### *Admissibility of Plaintiffs' Expert Testimony*

■ The Supreme Court of Alabama has recognized that expert testimony is usually required in cases involving complex products or claims. *Brooks v. Colonial Chevrolet–Buick,* 579 So.2d 1328, 1332 (Ala.1991). According to the *Federal Rules of Evidence,* it is the trial court's responsibility to determine whether a person is qualified to testify as a witness. Rule 104(a). The *Federal Rules of Evidence* also set forth the situations in which expert testimony may be used by a party. Rule 702 provides as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, · skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Federal Rules of Evidence.* Thus, a court must make a determination of whether the expert's testimony would assist the trier of fact. *Kingsley Associates, Inc. v. Del–Met, Inc.,* 918 F.2d 1277 (6th Cir.1990); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).

■ Federal courts have allowed persons to testify as expert witnesses even though they did not possess certificates of training or education, memberships in professional organizations, and may not have been the most outstanding practitioners in their fields. *See United States v. Barker,* 553 F.2d 1013, 1024 (6th Cir.1977). In general, the fact that an expert does not have a degree or license in his or her professed specialty goes to the weight of his or her testimony rather than its admissibility. *United States v. Bilson,* 648 F.2d 1238, 1239 (9th Cir.1981). In fact, in a recent products liability case, one court found that a proposed expert's lack of specialization in certain areas of engineering does not go to the admissibility of the expert's opinion, but merely affects its weight. *See, e.g., Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994).

In this case, Dr. Durig concluded that baffles should have been installed in the spray tank if it were going to be used on a three-wheeler. Kuker contends that Dr. Durig should be barred from giving an expert opinion about mobile tank safety because he has never designed mobile tanks. Kuker further claims that Dr. Durig's testimony should be inadmissible because he is unaware of any publications that suggest, or industry standards that require, that baffles be installed in 150–gallon spray tanks mounted on turf care vehicles. Kuker essentially argues that because Dr. Durig's opinion is based solely upon his belief that installing baffles on a three-wheeled vehicle would be "good engineering practice," it would not be helpful to a lay person trying to determine whether the spray tank was defective. ·

■ The court finds that Dr. Durig has a strong background in mechanical engineering. He has an earned Ph.D. in mechanical engineering and has also been certified as a professional engineer in South Carolina.

Furthermore, Dr. Durig has visited the site of the accident and viewed the accident vehicle. He has administered several tests based on his observations, relying on his background in mechanical engineering to draw his conclusions. Moreover, Dr. Durig's theory that the installation of baffles would have minimized the dangerousness of the product seems to be a rather elementary principle of engineering that does not require a great deal of specialized knowledge about 150–gallon spray tanks. Accordingly, the court finds that Dr. Durig possesses the requisite background and has obtained the necessary information to aid a jury in deciding whether the absence of baffles made the spray tank unreasonably dangerous when it was attached to the Cushman vehicle. Kuker should address any deficiency it perceives in Dr. Durig's background in its cross-examination and in its arguments to the jury. Because Dr. Durig's testimony is admissible, the court finds that Kuker's motion for summary judgment should be denied.

### UMI's Motion for Summary Judgment

Defendant UMI manufactured and designed the spray tank that Kuker integrated into the sprayer system. UMI contends that its spray tank was a general purpose product, and as such, UMI deserves summary judgment. In the alternative UMI argues that it deserves summary judgment because the spray tank was intended solely for use on a pickup truck. Finally, UMI argues that the court should grant its motion for summary judgment because the spray tank was not dangerous beyond the reasonable expectations of the consumer.

### The Alabama Extended Manufacturer's Liability Doctrine

The AEMLD is a judicially created products liability doctrine. *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976). The Supreme Court of Alabama recently articulated the requirements to prove a prima facie case under the AEMLD. According to the Court, a plaintiff must show the following: (1) that the defendant manufactured, designed or sold a defective, unreasonably dangerous product; (2) that the product reached the consumer in substantially the same condition in which it was sold; and (3)

that the product injured the consumer when it was put to its intended use. *Beam v. Tramco, Inc.*, 655 So.2d 979, 981 (Ala.1995).

According to the Court, "a defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the parties." *Id.* at 981. Moreover, " . . . it makes no difference whether it is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used." *Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 133 (Ala.1976). Finally, "[w]hether a product is 'unreasonably dangerous' is for the trier of fact, just as negligence, vel non, is in a traditional negligence case." *Id.*

The Court has allowed a defendant to plead several affirmative defenses to an AEMLD claim. These include contributory negligence, product misuse, assumption of risk, and lack of a causal relation. *See Dennis v. American Honda Motor Co.*, 585 So.2d 1336, 1339 (Ala.1991); *Kelly v. M. Trigg Enterprises, Inc.*, 605 So.2d 1185, 1192 (Ala. 1992); *see also Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537 (11th Cir.1992). Because these are affirmative defenses, a defendant who moves for summary judgment has the burden of proving that there is no genuine issue of material fact as to each of the elements of the defenses raised. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 470 (11th Cir.1993).

### General Purpose Product

UMI first contends that the spray tank should be classified as a general purpose product, and as such should be excluded from claims brought under the AEMLD. At the outset, the court notes that generally:

> [t]he mere fact that a product has been altered or modified does not . . . relieve the manufacturer or seller of liability . . . if the alteration or modification did not in fact cause the injury, or if the alteration or modification was reasonably foreseeable to the manufacturer or seller.

*Hicks v. Commercial Union Ins. Co.*, 652 So.2d 211, 217 (Ala.1994) (citations omitted). However, the Supreme Court of Alabama has created an exception to this general rule in order to protect manufacturers of "multifunctional, general purpose" products from claims under the AEMLD. *Johnson v. Niagara Machine & Tool Works*, 555 So.2d 88, 92 (Ala.1989) (adopting the reasoning of *Gordon v. Niagara Machine & Tool Works*, 574 F.2d 1182, 1189–1190 (5th Cir.1978)). According to the Court, the manufacturer of a product classified as a general purpose product should be granted summary judgment because there are so many potential applications of the product that any particular use of the product "is unforeseeable as a matter of law." *Johnson*, 555 So.2d at 93 (Ala.1989). As a result, the burden to provide safety devices for each particular function of the product shifts from the manufacturer of the general purpose product to the purchaser. *Johnson*, 555 So.2d at 93 (Ala.1989).

In *Johnson*, the Court considered a motion for summary judgment by a manufacturer of a die press. *Id.* According to the Court, the die press had been shipped to the purchaser in a "naked" configuration. *Id.* at 91. The purchaser had then made several modifications to the die press including "the addition of a large flywheel and hub arrangement, a homemade automatic feed, a removable barrier guard, and a change in the location of the operator's station to the front of the press." *Id.* According to testimony in the case, it would have been impossible for the manufacturer of the press to design a safety guard system that would adequately protect users of the many types of manufacturing machines into which the press could be integrated. *Id.* at 92.

In the Court's most recent discussion of the general purpose product exception, the Court held that a trailer incorporated into a tractor-trailer rig was not a general purpose product and that defendants did not deserve summary judgment. *Osmer v. Belshe Indus., Inc.*, 585 So.2d 791, 796 (Ala.1991). The *Osmer* decision further elaborated on the rule set out in *Johnson*, stating that:

> The gist of this Court's opinion in *Johnson* was that our law would not require manufacturers of general purpose products to foresee and forestall any negligent use of the products when there were *nearly unlimited possible uses and configurations . . . .* The trailer in this case is not like the press in *Johnson*. In fact, it was designed to haul equipment of the type being hauled when the accident occurred, and it was readily useable for that purpose upon purchase. Although designed for that purpose, the trailer was not equipped with any [safety devices] to prevent the equipment being transported from sliding off a steel base . . ., and the purchaser-user was not made aware that such safety measures were available. Because there was evidence suggesting that the possibility of sliding equipment was readily foreseeable, this court will not hold that this trailer is a "general purpose" product as to which the manufacturer can avoid liability as a matter of law.

*Osmer*, 585 So.2d at 795–796 (Ala.1991) (emphasis added).

UMI urges the court to consider the decision of *Watts v. TI, Inc.*, where the manufacturer of a cab and chassis incorporated by the purchaser into a garbage truck was granted summary judgment against plaintiff's AEMLD claim because the Court determined that the cab and chassis were general purpose products. 561 So.2d 1057, 1059 (Ala. 1990). In *Watts*, the plaintiff had fallen off of a step attached to the garbage body of a truck and was run over by the rear wheels. The *Watts* Court relied heavily on the fact that the plaintiff submitted no evidence that the manufacturer knew "for what *purpose* the truck would be used" at the time of contracting. *Id.* (emphasis added). Furthermore, as in *Johnson*, there is no evidence that the cab and chassis manufacturer could have developed a safety device which would have protected users against the many potentially dangerous applications of the cab and chassis.

■ The court finds that the present facts are more analogous to those of the *Osmer* case than to those of either the *Johnson* case or the *Watts* case. In both *Johnson* and *Watts*, the Court emphasized that the manufacturers had little indication of the purpose for which their products might be used. In *Osmer*, on the other hand, the

Court noted that the trailer was designed for the purpose of hauling heavy equipment. Similar to the facts of *Osmer*, UMI's spray tank was designed to be used for one purpose—as a spray reservoir from which spraying equipment could be operated. This is the same purpose for which it was being used when the accident occurred.

Moreover, in both *Johnson* and *Watts*, there was no safety device that could be developed to protect against all potentially dangerous applications. In *Osmer*, however, the manufacturer failed to provide guardrails on the trailer that caused the accident even though it provided guardrails on some trailers if they were requested to protect against the sliding of heavy machinery. The *Osmer* Court found that guardrails should have been installed on all trailers regardless of whether the customer asked for them. Similarly, one safety device, the installation of baffles, would allegedly have sufficed to make UMI's spray tank safe for its intended use as a spray reservoir. Just as the manufacturer in *Osmer* recognized the dangerousness of its product, UMI has recognized the danger of free movement of a liquid inside a spray tank. According to the affidavit of Charles Carlsen, UMI regularly places baffles in larger spray tanks. Carlsen's Aff. at 3. Just because UMI chose not to install baffles in its smaller spray tanks does not make them safe for their intended use. Based on the foregoing discussion, the court finds that the spray tank is not a general purpose product as to which the manufacturer deserves judgment as a matter of law.

### Product Misuse

UMI also claims that it should be granted summary judgment because the spray tank it manufactured was intended to be used in the beds of small pickup trucks, and there is no evidence before the court that these tanks are unsafe or unreasonably dangerous when used for this intended purpose. Although UMI avoids the "term of art" in its argument, it appears that UMI is attempting to argue the affirmative defense of product misuse.

To assert product misuse as a defense under the AEMLD, the defendant must put forth evidence "showing that the plaintiff used the product in some manner different from that intended by the manufacturer." *Kelly*, 605 So.2d at 1192 (citations omitted). For purposes of the AEMLD, use is intended if it is one that is "reasonably foreseeable by the ... manufacturer." *Id.* at 1192.; *Hicks v. Commercial Union Ins. Co.*, 652 So.2d 211, 219 (Ala.1994). *See also Gean v. Cling Surface, Co.*, 971 F.2d 642 (11th Cir.1992). The Supreme Court of Alabama has also noted that "these principles apply to the use of the product by the plaintiff or the plaintiff's decedent as they do to the use of the product by third parties." *Id.* at 1192. The Court has further emphasized that "[o]rdinarily, whether someone misused an allegedly defective product is a factual issue for the jury." *Sears, Roebuck & Co. v. Harris*, 630 So.2d 1018, 1028 (Ala.1993); *Kelly*, 605 So.2d at 1192; *Banner Welders, Inc. v. Knighton*, 425 So.2d 441, 448 (Ala.1982); *Beloit v. Harrell*, 339 So.2d 992, 997 (Ala.1976).

UMI claims that its 150–gallon spray tank was intended primarily for use on pick-up trucks. UMI thus argues that the spray tank, when attached to the Cushman three-wheel vehicle, was used in manner not intended by UMI. Even if Kuker used the product in a way that was not intended by UMI, the factual issue of whether the alleged misuse of the product was reasonably foreseeable to UMI still exists. Using the test set out by the Supreme Court of Alabama, the proper question under these facts is whether it would have been reasonably foreseeable for the spray tank to have been used as part of a weed spraying system on a Cushman three-wheel vehicle.

According to the testimony of Charles Carlsen, President of UMI, UMI sold 150–gallon spray tanks to Kuker in various quantities throughout the years. Carlsen's Aff. at 2. Although UMI developed its 150–gallon spray tank for use on pick-up trucks, Carlsen testified that UMI was aware that Kuker was using the spray tank on vehicles other than pick-up trucks. In this regard, Carlsen's deposition of July 10, 1995, reflects the following:

Q: ... Do you understand that—or was it your understanding at any point that Kuker was using your tank in a similar

application as shown on Plaintiffs' Exhibit 5?

A: I can't say for this specific example. I knew that they were using it in non-pickup truck tank applications.

Carlsen's Dep. at 57. Carlsen further stated that UMI regularly installs baffles in its larger spray tanks. Carlsen's Aff. at 3. Thus, Carlsen's testimony indicates that UMI may have been aware of the potential danger of sloshing liquids in its tanks when used in sprayer systems to spray weeds. As a result, UMI has failed to meet its burden of showing that the spray tank was being used in a way that was unforeseeable as a matter of law. Therefore, the court finds that UMI's defense of product misuse presents genuine issues for the jury.

### Not Dangerous Beyond the Reasonable Expectations of the Consumer

█ Finally, UMI claims that it is entitled to summary judgment because the spray tank it manufactured is not dangerous beyond the reasonable expectations of the consumer when it is used on the Cushman three-wheel vehicle. Despite the Court's general rule that the determination of whether a product is defective under the AEMLD is a jury function, if a court finds that a product is not dangerous beyond the reasonable expectations of the consumer, then the court should enter summary judgment in favor of the defendant. *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir.1990); *Beech v. Outboard Marine Corp.*, 584 So.2d 447, 450 (Ala.1991); and *Hawkins v. Montgomery Indus. Int'l, Inc.*, 536 So.2d 922, 926 (Ala.1988).

█ According to the Eleventh Circuit, "certain products whose inherent danger is patent and obvious, do not, as a matter of law, involve defects of a sort that a jury should resolve." *Elliott*, 903 F.2d at 1507. For a product to be dangerous beyond the reasonable expectations of the consumer, the parties involved must have " 'contemplated' the nature of the defect at the time of the accident." *Id.* at 1507 (citing *Hawkins*, 536 So.2d at 926 (Ala.1988)). The Eleventh Circuit has also noted that "the use of certain products ... has always been firmly grounded in common sense." *Elliott*, 903 F.2d at 1507 (citing *Entrekin v. Atlantic Richfield*

*Co.*, 519 So.2d 447, 450 (Ala.1987)). In this regard, the court stated:

Some products, by their nature, (or, in modern parlance, by their conscious design), place both users and bystanders in some measure of danger.... [We] do not hold manufacturers liable simply because the use of their products involves some risk: 'To illustrate, the manufacturer who makes, properly and free of defects, an axe or a buzz saw or an airplane with an exposed propeller, is not to be held liable if one using the axe or the buzz saw is cut by it, or if someone working around the airplane comes in contact with the propeller.'

*Elliott*, 903 F.2d at 1507 (citing *Stovall & Co. v. Tate*, 124 Ga.App. 605, 184 S.E.2d 834, 838 (1971)). Citing this exception, the Eleventh Circuit held that a propeller manufacturer deserved summary judgment against a plaintiff who was injured when she jumped into the water next to a revolving propeller because it would have been obvious to an ordinary consumer that a revolving propeller was dangerous. *Elliott*, 903 F.2d at 1507. The Supreme Court of Alabama, adopting the consumer expectation test set out in *Elliott*, held in favor of the defendant on a motion for summary judgment under almost identical facts to those of the *Elliott* case. *Beech*, 584 So.2d at 450.

█ The court believes that the Cushman truckster involved in this case is not analogous to the patent and obvious danger of such products as a spinning propeller, a buzz saw, or an axe. Thus, the court finds that it would not be apparent to the objective consumer that the Cushman sprayer is by its very nature a dangerous product. Consequently, the court rejects UMI's argument under this objective test.

UMI further contends, however, that the testimony of the plaintiffs indicates that the plaintiffs were aware that the Cushman truckster might overturn. UMI argues that although an objective test was used in both *Elliott* and *Beech*, the Supreme Court of Alabama used a separate subjective test in *Hawkins*. In *Hawkins*, the Alabama Supreme Court held that a manufacturer and a seller of a blowpipe suction system used to remove wood shavings from a planer machine

deserved summary judgment against a lumber planer who was injured when he attempted to unclog the system. *Hawkins,* 536 So.2d at 927. According to the plaintiffs in *Hawkins,* the clogging of the blowpipe system was the alleged defective condition. Because it was apparent from the testimony of the plaintiffs that this defective condition occurred weekly, the court determined that some clogging of the stationary machine was "contemplated" by the parties at the time of the accident. Therefore, the court determined that the machine was not defective.

■ UMI submits that the plaintiffs knew that the Cushman sprayer might overturn when it was driven on slopes or uneven ground. It is true that there is some testimony to this effect; however, the plaintiffs' testimony also indicates that the plaintiffs had not contemplated that the Cushman sprayer might roll over in the area in which they were traveling at the time of the accident. Plaintiff Matthew Hutton testified as follows:

Q: Now how many times in your judgment had you operated the Cushman on this particular incline before the accident?

A: Three to four times.

Q: And is that three or four times when you were driving the vehicle or three or four times when you were a passenger?

A: There have been times that I was a passenger and there have been times that I operated the Cushman alone on that incline.

Q: On any other occasions had you ever had a problem with the vehicle overturning or anything on that incline?

A: Not on that particular incline.

Q: I'm going to ask you about the others in just a minute. But on this particular incline where this culvert is where the accident occurred, you had never had any problems?

A: No never had any problems there.

Hutton's Dep. at 39–40. Similarly, Plaintiff Jimmy Dickerson testified as follows:

Q: Had you driven the scooter along this same path that you were going at the time of the accident? Had you driven it along that path on other occasions?

A: Yes.

Q: Do you have a judgment as to how many occasions you had driven this route prior to the accident?

A: At least three.

Q: When you say at least three, those three—and I realize it could have been more—were they shortly prior to the accident or were they spread out? Are you talking about spread out over a period of a year or two?

A: A year or two.

Q: And on the other occasions, you had driven along the same path that you were going at the time of the accident, had you had any problems?

A: No.

\* \* \* \* \* \*

Q: Had you at any time ever been cautioned about driving on slopes or inclines?

A: No.

Q: Had Mr. Turnbow ever discussed that with you at all?

A: No.

Q: Have you and Mr. Hutton ever discussed whether it was a safe practice to drive on the incline?

A: No.

Dickerson's Dep. at 59–61. The testimony of both plaintiffs shows that they had no indication that the Cushman sprayer might roll over on the incline where the accident occurred. In other words, they did not contemplate that the Cushman sprayer was dangerous at the time the accident occurred. Thus, the court concludes that under the *Hawkins* test, the defectiveness of the Cushman sprayer was not so patently dangerous and obvious that the court should grant UMI's motion for summary judgment. Therefore, the court finds that UMI's motion for summary judgment should be denied.

### Tieco's Motion for Summary Judgment

Defendant Tieco, the retailer, combined the Kuker sprayer system and the Cushman three-wheel vehicle and then marketed and sold the finished product to the employer of the plaintiffs. Tieco relies on, among others,

the defense of "no causal relation." *Atkins,* 335 So.2d at 143.

### No Causal Relation

 In order to prevail upon the defense of no causal relation, a defendant must show the following:

> ... that he [or she] is in the business of either distributing or processing for distribution finished products; he [or she] received a product already in a defective condition; he [or she] did not contribute to this defective condition; [and] he [or she] had neither knowledge of the defective condition, nor an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer.

*Consolidated Pipe & Supply Co. v. Stockham Valves & Fittings, Inc.,* 365 So.2d 968, 970 (Ala.1978) (citations omitted). According to the Court, "[i]f the defect was latent and could not have been discovered by either the consumer or the distributor by a reasonable inspection, neither had a superior opportunity." *Id.* Because Tieco raises this as a defense to plaintiff's claim, Tieco bears the burden of showing that there is no genuine issue of material fact regarding the no causal relation defense. *See, Reynolds,* 989 F.2d at 470.

Tieco does not dispute that it combined the Cushman truckster with the Kuker sprayer system and then sold it as a Cushman three-wheeled sprayer to the employer of the plaintiffs; however, Tieco claims that the defects in the product it sold to the plaintiffs' employer existed before Tieco received the truckster or the sprayer system. Tieco argues that Cushman, not Tieco, should have provided seat belts and ROPS for the three-wheel sprayer. Furthermore, they contend that either UMI or Kuker rather than Tieco should have been responsible for installing baffles inside the spray tank to prevent the liquid from shifting inside the tank. To support these claims, Tieco cites the deposition of the plaintiffs' expert, Dr. Durig, who testified that Cushman was in a better position to provide seat belts and ROPS to make the Cushman three-wheel truckster safer, and that the spray tank manufacturer should have been responsible for providing baffles.

Tieco further notes that the Kuker spraying system was designed specifically for the Cushman three-wheeler, and that Tieco made no alterations to either the Cushman vehicle or the sprayer system before it combined the two products to produce the Cushman sprayer. Tieco has submitted the testimony of Mr. LeClaire and photographs of both the sprayer system and the Cushman vehicle to emphasize the simplicity of integrating the two products. Based on this evidence, Tieco claims that it merely combined these two products without contributing to the defective condition of the Cushman sprayer.

Finally, Tieco argues that it was not in a superior position to that of the consumer to notice the defects in either the spray tank or the three-wheeler. Tieco cites the deposition of Jim Roberts, Vice President of Tieco, Inc., in Montgomery, Alabama, who maintains that Tieco never had any problems with Cushman trucksters or Kuker sprayer systems before this lawsuit. Roberts also notes that Kuker did not provide any information to Tieco about the stability of the sprayer system on three-wheel vehicles and that Kuker had tested the sprayer system on three-wheel vehicles. Thus, it is Tieco's position that it should not be responsible for the defects in either the spray tank or the Cushman three-wheeler if defects exist.

 Notwithstanding the above arguments by Tieco, the court finds that Tieco should not be granted summary judgment. According to the testimony of Dr. Robert Turnbow ("Dr. Turnbow"), the person responsible for purchasing the Cushman truckster, Tieco provided a 150–gallon spray tank even though Dr. Turnbow's original order provided for a 120–gallon spray tank. Dr. Turnbow testified specifically as follows:

> Q: As I understand your earlier testimony, you said that you wanted a one hundred and twenty gallon spray tank?
>
> A: That was what was on the specification ... it's just when it came, it had a hundred and fifty gallon tank on it.

Turnbow's Dep. at 146–147. Furthermore, the plaintiff's expert, Dr. Durig, testified in his affidavit of May 2, 1995, that by attaching a spray tank that was 25% larger than the spray tank that the federal government ordered, Tieco increased the instability of the Cushman truckster. Durig's Aff. at 2. Ac-

cording to Dr. Durig, if Tieco had provided a sprayer system with a 120–gallon spray tank rather than a sprayer system with a 150–gallon spray tank, the weight on the back of the truckster would have been reduced and the three-wheeled truckster would have been less likely to roll over.

In addition, Dr. Durig testified to the following in his deposition:

Q: Tell me what your position is as it relates to Tieco, Inc..

A: That they added a tank on the rear of the vehicle. That increased the propensity for the thing to roll over. If they hadn't have put the tank on there, then it obviously wouldn't be able to do its function. But the vehicle would not have been—It would have been less dangerous, I guess, in a way.

\* \* \* \* \* \*

Q: Well, are you saying that it would be incumbent upon Tieco, Inc. to go to the manufacturer who sent them the tank to find out what effect the tank would have on the Cushman truckster?

A: I would at least want to talk to them about it, yes. If I was Tieco, I wouldn't be buying products and sticking them on something without knowing how it operated.

\* \* \* \* \* \*

Q: Do you know of any standards that Tieco, Inc., violated in this case that specifically relates to the retailer?

A: The retailer?

Q: Yes.

A: If you want to consider them part of the manufacturer since they did combine these two pieces of equipment. They didn't manufacture each one individually or anything. But I don't know of any retail standards out there that they could go check ROPS or anything.

Durig's Dep. at 146–151. It is clear from the testimony above that Dr. Durig has concluded that Tieco caused the finished product bought by the plaintiff to become more dangerous.

Based on the evidence above, it is the court's view that Tieco has failed to meet its burden of showing that it did not contribute to the defective, unreasonably dangerous condition of the final product it sold to the plaintiffs' employer, i.e., the three-wheeler combined with the sprayer system and 150–gallon spray tank. The fact that defects in each of the products contributed to the unreasonably dangerous condition of the final product has no bearing on whether Tieco independently contributed to the unreasonably dangerous condition of the final product.

As a result, the court finds that the plaintiffs have presented sufficient evidence that, if true, would show that Tieco contributed to the unreasonably dangerous condition of the final product. Accordingly, a factual question exists as to whether Tieco contributed to the defective, unreasonably dangerous condition of the final product and the court must deny Tieco's motion for summary judgment.

### CONCLUSION

Based on the foregoing analysis, it is CONSIDERED and ORDERED that defendant Kuker's motion for summary judgment be and the same is hereby DENIED.

It is further CONSIDERED and ORDERED that defendant UMI's motion for summary judgment be and the same is hereby DENIED.

It is further CONSIDERED and ORDERED that defendant Tieco's motion for summary judgment be and the same is hereby DENIED.