ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Flatland Realty, LLC | ) | ASBCA No. 63409 |
| | ) | |
| Under Contract No. DACW43-1-14-49 | ) | |

APPEARANCE FOR THE APPELLANT: Mr. Tyler Brinkmann
                                                       Owner

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
                                                                Engineer Chief Trial Attorney
                                                            Brandon D. Belt, Esq.
                                                                Engineer Trial Attorney
                                                                U.S. Army Engineer District, St. Louis

OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

Appellant challenges the government's revocation of its lease, and requests $800,000, plus interest. The parties have submitted the appeal on the record under Board Rule 11. We conclude that the revocation was a breach, and award $210,000, plus interest.

FINDINGS OF FACT

In 2014, the government and an entity known as KFE, LLC, entered into a 15-year lease requiring KFE to operate a commercial concession eventually called "The Lake House Carlyle," at the Dam East Recreation Center, Carlyle Lake, in Illinois.[1] On February 4, 2016, the lease was assigned to appellant, Flatland Realty, LLC.[2] The assignment extends the lease expiration date to September 14, 2030, and includes a Use and Development Plan (UDP).[3] The UDP includes a "Five-Year Plan" that sets forth development benchmarks for "Year One" through "Year Five," as well as minimum performance requirements for those periods that include the provision of kayaks and bicycles for rent to visitors to the lake, and the operation of a fish restaurant.[4]

---

[1] R4, tab 3 at 24, 39-40, 49, tab 7 at 116.
[2] R4, tab 4 at 52-53.
[3] *Id.* at 52-53 ¶¶ 2-3, 58-60.
[4] *Id.* at 58-60 §§ II, V.

The lease provides that "[t]he use and occupation of the premises shall be subject to the general supervision and approval of the District Engineer," and that "[m]odifications to [the UDP] must be approved in writing by the District Engineer prior to implementation of the change."[5] The lease also provides that "[t]his lease may be revoked in the event that the Lessee violates any of its terms and conditions and continues and persists in such non-compliance," and that "[f]ailure to satisfactorily correct any substantial or persistent noncompliance within the specified time is grounds for . . . revocation of the lease, after notice in writing of such intent."[6] The lease does not contain a termination for convenience clause. Finally, the lease provides that if "this lease is revoked, the Lessee shall vacate the premises, remove [its] property, and restore the premises . . . within such time as the District Engineer may designate," and that "if the Lessee shall fail or neglect to remove said property and restore the premises, then, at the option of the District Engineer, said property shall either become the property of the United States without compensation therefore, or the District Engineer may cause the property to be removed and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work."[7]

Within a few months of the assignment of the lease, Flatland proposed that the UDP be revised.[8] The government approved some revisions and disapproved others, stating that "[t]he intent of the lease is to provide water based outdoor recreational opportunities to the public."[9] In 2020, the parties began discussions on a new UDP: in August 2020, the government responded to a proposal by Flatland that would "offer the facility to the public as an event venue for weddings and parties for the next five years."[10] The government agreed that, during "Year 1," Flatland could "run the building as an event venue, under the conditions and guidelines for COVID-19," but rejected that proposal for Years 2-5, explaining that although "[t]he building may be used for events during the off-season (October through April)," the UDP "needs to demonstrate offering recreational opportunities during the recreational season (May through September) that are dependent upon the lake project's natural and other resources."[11] The government admits that Flatland was "allowed to use the space as an event venue for a limited amount of time during the COVID-19 pandemic as a temporary accommodation."[12] Indeed, on several occasions in 2021, the government

---

[5] R4, tab 3 at 27 ¶ 5(d).
[6] *Id.* at 32 ¶ 19(a).
[7] *Id.* at 29-30 (alterations added).
[8] Gov't br., ex. B.
[9] *Id.* at 2.
[10] *Id.*, ex. D.
[11] *Id.*
[12] *Id.* at 18.

approved requests by Flatland to host weddings at the Lake House.[13]  Statements of account from 2020 and 2021 indicate that the concession was at least nominally operational during that period, with the government earning $418.92 in rent derived from concession revenue that included $17,250 from "building use" in 2021.[14]

Despite the apparent agreement that the concession could be operated at least some of the time as a wedding and event venue, the parties did not agree on all the details of a new UDP.  In March 2021, the government rejected a UDP that Flatland had proposed, and warned Flatland that, "in the absence of a legitimate, viable Use and Development Plan, termination of the lease is imminent."[15]  Among the government's objections to Flatland's proposal was a lack of detail regarding "what actions [Flatland] will be taking that will result in a functioning restaurant," that Flatland proposed "offering fewer recreational opportunities at the site than previously offered," and that whereas "the leased area needs to be operational as a recreational facility during the recreation season (April 1 through Oct 31)," Flatland's plan gave "no indication as to how [Flatland] plan[ned] to implement a recreational facility that meets those requirements."[16]  The government complained that "[t]he facility has not been operational for two years, well before COVID-19 became a factor."[17]  The government informed Flatland that "[t]his is the final notice you will receive attempting to gain compliance with the terms and conditions of the lease," and that "[t]his office must receive a viable Use and Development Plan . . . no later than April 30, 2021, or the lease will be terminated . . . ."[18]

On August 6, 2021, the government requested changes to a proposed UDP that Flatland had provided, and requested additional information no later than September 1, 2021.[19]  On August 30, 2021, the parties agreed that Flatland would provide a new UDP by October 31, 2021.[20]  On October 31, 2021, Flatland provided a UDP that states, for "Year One," "Find a qualified full time Manager."[21]

On December 7, 2021, the government revoked the lease by letter, "effective January 1, 2022," informing Flatland that its proposed UDP could not be approved because Flatland "ha[d] been unable to provide a plan for facilities that meet the expectations of a commercial concessions lease," and that "[s]ignificantly, the plan

---

[13] App. reply br., ex. M.
[14] *Id.*, ex. I at 412-19.
[15] R4, tab 8 at 118-19.
[16] *Id.*
[17] *Id.* at 119.
[18] *Id.* at 119.
[19] R4, tab 7 at 116-17.
[20] R4, tab 11 at 128.
[21] R4, tab 12 at 135, tab 13 at 136; *see* gov't br. at 6 ¶ 20.

points out that there is currently no qualified manager for the proposed facility." [22] The government requested that Flatland submit a plan to restore the premises within 30 days of Flatland's receipt of the government's letter.[23]

In April 2022, Flatland having requested guidance,[24] the government provided a draft restoration plan to Flatland for its review and revision, and set a May 15, 2022 deadline for Flatland's final restoration plan, and a June 20, 2022 deadline for removal of Flatland's property from the site.[25] On May 16, 2022, Flatland informed the government that it would not sign the draft restoration plan or return it to the government, but would follow the restoration plan to the "best of [its] ability," and indicated that restoration would not be completed by June 20, 2022.[26] On May 23, 2022, the government notified Flatland that "[d]ue to your refusal to submit a restoration plan for the removal of improvements from and restoration of the leased area, all property that remains on the premises **effective immediately**, will become property of the United States without compensation, per the terms of the lease."[27] On May 24, 2022, the government told Flatland that the lease "was terminated because [Flatland was] unable to provide recreational opportunities to the public during the recreation season."[28]

On May 26, 2022, Flatland submitted to the contracting officer its certified claim alleging wrongful termination of the lease, and demanding $800,000 in alleged damages.[29] The contracting officer received Flatland's amended claim on July 21, 2022,[30] and denied that claim on August 24, 2022.[31]

In support of its request for compensation, Flatland offers a November 2021 "enterprise valuation" of the Lake House concession, containing an appraisal that finds that "[t]he company is a wedding venue business," and that "[t]he management team is similar to that of a typical wedding venue business."[32] Based at least in part upon forecasts of revenue through 2025, the appraisal estimates the fair market value of the concession at $360,640, and, "[a]fter subtracting term debt if any," estimates what we understand to be the bottom-line valuation of the business (what the appraisal

---

[22] R4, tab 13 at 136.

[23] *Id.* at 137.

[24] R4, tab 14 at 139.

[25] R4, tab 18 at 150.

[26] *Id.* at 149.

[27] R4, tab 20 at 154-55 (emphasis in original).

[28] App. reply br., ex. J at 229.

[29] R4, tab 1 at 1, 3, tab 2 at 22 ¶ 9.

[30] R4, tab 24 at 203.

[31] R4, tab 2 at 16, 22.

[32] App. reply br., ex. B at 8.

describes as the "equity value") at $360,000.[33] The appraisal was prepared by Daniel P. O'Connell,[34] who, although not a certified appraiser, claims to be a candidate for membership in the American Society of Appraisers (ASA) who has "tested out" of (presumably meaning that he has successfully completed) several ASA courses.[35] Mr. O'Connell further asserts that his appraisal "adheres to the [Uniform Standards of Professional Appraisal Practice (USPAP)] guidelines."[36]

DECISION

When a contractor challenges the default termination of a lease, the government has the burden of establishing the validity of the termination. *Oscar Narvaez Venegas*, ASBCA No. 49291, 98-1 BCA ¶ 29,690 at 147,140. The government says that "the lease area did not have an operational facility since 2019," and that Flatland "failed to submit a UDP that met with the requirements of a [government] commercial concession lease for over two years following the expiration of Flatland's initial UDP."[37]

Flatland says that the lease does not require the submission of a new UDP, and that "the failure of agreement between the parties on a 'new' Plan is not grounds for Lease termination."[38] Flatland also disputes that the facility was not operational for two years, stating that:

> EXHIBIT I shows that the Government cashed the checks paid to them for the Use Fee (a percentage of sales) during 2020 and 2021, yet they still claim here that there was not an operational business. As admitted by the Government, the Appellant was given permission to solely host events in 2020, yet he was forced to cancel them because of COVID. Now, the Government says that the same lack of business caused by COVID is a reason for lease termination.[39]

Although the contracting officer revoked the lease solely on the ground that Flatland did not submit an "approvable" UDP, we may uphold a termination for

---

[33] *Id.* at cover page, 1, 19, 22.
[34] *Id.* at 1, 24.
[35] *Id.* at 24.
[36] *Id.* at 3.
[37] Gov't br. at 10, 12 (alteration added).
[38] Compl. at 5 ¶¶ 17(b), (c), 6 ¶ 18(b).
[39] App. reply br. at 3.

default on any ground existing at the time of the termination, even where the contracting officer's final decision relies upon other grounds. *GSC Constr., Inc.*, ASBCA Nos. 59402, 59601, 16-1 BCA ¶ 36,438 at 177,604. The government fails to demonstrate that revocation of the lease was justified because the concession was not operational for a two-year period spanning 2019 and 2021. First, the government does not identify the specific periods during which the concession was allegedly not operational, nor does it define the term operational; specifically, it does not argue that in this context, operational means providing recreational opportunities such as kayaks and bicycles for rent. Second, in support of the assertion that the site was not operational for two years, the government cites mostly its own correspondence; the exception is Rule 4, tab 12, which is Flatland's proposed UDP.[40] None of that persuades us that the concession was not operational during the two-year period in question. Indeed, we have found that the concession was at least nominally operational in 2021, evidenced by concession earnings that include more than $17,000 in "building use" revenue presumably derived from the weddings and wedding receptions that the concession hosted in 2021, with the government's approval.

Regarding whether Flatland timely submitted an approvable UPD, we find nothing in the lease or the UDP that causes a UDP to expire after five years. Rather, the UDP indicates that by Year Five, the lessee is expected to have taken certain development steps in addition to meeting minimum performance requirements along the way. And although the lease provides that modifications to the UDP must be approved in writing by the government prior to implementation of the change, even if the UPD did expire after five years, nothing in the lease provides at the end of those five years, the lessee is required to submit a new UDP that meets with the government's approval, as opposed to the parties negotiating, if they wish, the terms of a new UDP. Rather, the lease supports the interpretation that after Year Five, the lessee will be expected to continue to meet the UDP's requirements, and that if the lessee wishes to modify those requirements or any other aspect of the UDP, the government has the right to reject such modification. For these reasons, we conclude that the government was not justified in revoking the lease. Because the lease lacks a termination for convenience clause, the unjustified revocation is, consequently, a breach. *Krygoski Const. Co., Inc. v. United States*, 94 F.3d 1537, 1540-41 (Fed. Cir. 1996).

It is left for us to consider quantum. Flatland seeks $800,000, plus interest, consisting of (1) $460,000 for the building in which the concession operated, plus

---

[40] Gov't br. at 12.

(2) $360,000 for the business, minus (3) a $20,000 "salvage value," representing the value of property that Flatland has apparently removed from the concession site.[41]

We conclude that Flatland is not entitled to recover for the building. Although the government's revocation of the lease was a breach, the government *did revoke* the lease, triggering the lease's provisions governing removal of the lessee's property and restoration of the premises, which provisions provide, essentially, that property abandoned by the lessee becomes government property, without compensation, at the option of the government. Indeed, the government worked with Flatland on a restoration plan that would have resulted in the removal of Flatland's property from the site. After the government provided Flatland a draft plan that Flatland refused to sign, Flatland nevertheless represented that it would follow the draft plan but not meet the government's June 2022 deadline for removal of the property. Only then did the government invoke its option under paragraph 12 of the lease that the building become the property of the government, "without compensation therefore." After all, Flatland did not remove the property, and *then* seek compensation, for the cost of removal. Under these circumstances, Flatland is not entitled to recover anything for the building. *Cf. Adams Outdoor Advert. Ltd. P'ship v. Long*, 483 S.E. 2d 224, 226 (Va. 1997) (landowner became owner of billboard not removed by tenant at conclusion of tenancy or within a reasonable time thereafter; citing treatises).

With respect to the business (that is, the concession that Flatland was entitled to operate through September 14, 2030), Flatland must prove the fact of loss with certainty, as well as the amount of loss with sufficient certainty so that the determination of the amount of recovery will be more than mere speculation. *Tranlogistics LLC*, ASBCA Nos. 61366, 61450, 19-1 BCA ¶ 37,330 at 181,552. Flatland suffered the loss of the concession upon the revocation of the lease. To prove the amount of that loss, Flatland relies upon Mr. O'Connell's appraisal for its request for $360,000.[42] The government provides no response to Mr. O'Connell's assertion that his appraisal adheres to the USPAP guidelines, no expert opinion to counter Mr. O'Connell's assertions, and no appraisal of its own. Indeed, the entirety of the government's response is that (1) the appraisal "was based on a wedding venue business," (2) Flatland "was only allowed to use the space as an event venue for a limited amount of time during the COVID-19 pandemic as a temporary accommodation," and (3) the appraisal was not prepared by a qualified expert witness.[43] The government does not explain why Mr. O'Connell is not qualified to appraise the concession.

---

[41] *See* compl. at 1, 6 ¶ 19, 7 ¶ 21, 8; app. br. at 4; app. reply br. at 4, exs. A at 3, B at 22.

[42] App. reply br., ex. B, at 1, 18, 22, 24.

[43] Gov't br. at 18.

Regarding Mr. O'Connell's qualifications, although we are not bound by the Federal Rules of Evidence, we use them as a guide. Board Rule 10(c); *KiewitPhelps*, ASBCA No. 61184, 23-1 BCA ¶ 38,254 at 185,754. Federal Rule of Evidence 702, Testimony by Expert Witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

An expert need not be registered or the holder of degrees or certificates. *Smith v. Hobart Mfg. Co.*, 185 F. Supp. 751, 754 (E.D. Pa. 1960). Specialized degrees, licenses or publications in their field, while all commendable, are not required to be possessed by every witness acting as an expert. *Plywood Prop. Assocs. v. Nat'l Flood Ins. Program*, 928 F. Supp. 500, 508 (D. N.J. 1996). That an expert does not have a degree or license in his or her professed specialty goes to the weight of his or her testimony rather than its admissibility. *Dickerson v. Cushman, Inc.*, 909 F. Supp. 1467, 1472 (M.D. Ala. 1995).

It is up to the Board in its sound discretion to determine what evidence is admissible and the weight to be given it. *KiewitPhelps*, 23-1 BCA ¶ 38,254 at 185,755. Upon review of Mr. O'Connell's qualifications and his appraisal and the government's responses to them, and considering the guidance in Rule 702, we are persuaded to take Mr. O'Connell's appraisal into account. We find the appraisal helpful, but only partially persuasive, in that Mr. O'Connell misunderstood the concession as, exclusively, a year-round wedding venue. Although the government was willing to allow Flatland to operate the concession as a wedding venue during 2020 and 2021, the government did not agree to allow the concession to operate solely as a year-round, full-time wedding or other private event space beyond 2021. Rather, the government agreed only that Flatland could host weddings and other events during the seven-month "off-season," but that during the five-month recreational season, Flatland would have to provide recreational opportunities—presumably including

8

kayaking and bicycling—that were "dependent upon the lake project's natural and other resources." Accordingly, we do not credit Mr. O'Connell's conclusion that Flatland is owed $360,000 for its loss of the business. Rather, because the government was willing to allow Flatland to conduct the concession as a wedding and event venue for only seven of the twelve months of the year, we discount Mr. O'Connell's $360,000 figure accordingly, and award 7/12ths, or approximately .58, of that amount; that is, $210,000.

<u>CONCLUSION</u>

We have considered the parties' other assertions and arguments, and find them unnecessary to address. The appeal is sustained in the amount of $210,000, plus interest in accordance with 41 U.S.C. § 7109, from July 21, 2022, until the date of payment.

Dated: October 30, 2023


TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals


I <u>concur</u>                                                    I <u>concur</u>


RICHARD SHACKLEFORD                        MICHAEL N. O'CONNELL
Administrative Judge                              Administrative Judge
Acting Chairman                                    Acting Vice Chairman
Armed Services Board                            Armed Services Board
of Contract Appeals                               of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63409, Appeal of Flatland Realty, LLC, rendered in conformance with the Board's Charter.

Dated:  October 30, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals